## NATIONAL LABOR RELATIONS BOARD

v.

### D. GOTTLIEB & CO.

No. 10930.

United States Court of Appeals, Seventh Circuit.

Dec. 1, 1953.

A. Norman Somers, Asst. Gen. Counsel, Ivan McLeod, Atty., National Labor Relations Board, George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, and Louis Schwartz, Attys., National Labor Relations Board, Washington, D. C., and Dean E. Denlinger, Attys., National Labor Relations Board, Dayton, Ohio, for petitioner.

George L. Siegel, Herman Smith, Chicago, Ill., Allen H. Dropkin, Chicago, Ill., for respondent.

Before DUFFY, FINNEGAN and SWAIM, Circuit Judges.

DUFFY, Circuit Judge.

The Labor Board petitions for enforcement of its order dated February 27, 1953. The Board found that the company violated Sec. 8(a)(1) of the National Labor Relations Act, 61 Stat. 136, 29 U.S.C.A., Supp. V, Sec. 151 et seq., by interrogating its tool room employees concerning their union affiliations and by threatening to close the tool room. The Board found further that since this coercion caused the union to lose its majority status, the company remained under an obligation to bargain with the union, and by refusing to do so violated Sec. 8(a)(5) of the Act.

The company manufactures amusement devices and employs a total of approximately 200 persons. However, we are here concerned with only the tool room where six men were employed. These tool room employees were under the direct supervision of Foreman Kondor, who in turn was responsible to the plant superintendent, A. J. Jerard. The latter was not an officer or director of the company, but was responsible to and subject to orders issued by David Gottlieb, the president of the company.

The tool room was not a necessary adjunct to the company's operations, but was maintained as a matter of convenience. There were occasions in 1948 and 1949 when the space devoted to tool room work could have been utilized more profitably for production purposes. Prior to any union activity, and about April 1, 1951, Superintendent Jerard called together the four toolmakers and the foreman, explaining that business was slow, that in order to keep the tool room operating and in the hope of getting future orders, the company was going to take on a tooling job for the Kellogg Switchboard Company even though he knew that the company would lose money on the contract. He told the men that the company had been utilizing all of the space of the tool room just to keep a few fellows employed, and that it would have been more advantageous if the company had sold the equipment and had used the tool room space for produc-

tion purposes. The superintendent then asked the tool room employees to put forth their best efforts so that the company would lose as little as possible on the contract. The company started work on the Kellogg contract about April 15, 1951.

About April 30, 1951, the company hired one Melohn to work in the tool room. Superintendent Jerard knew at the time Melohn was hired that he was a union man. Melohn immediately began to promote and solicit union membership among the tool room workers. By May 10 all of the nonsupervisory employees, except one, had signed cards designating the union as their bargaining agent.

On May 15, 1951, the company received a letter from the union stating that it represented a majority of the tool room employees and requesting a meeting for the purpose of negotiating a contract. This was the first intimation the company officials had of any union activity among the tool room employees. On receiving the letter Superintendent Jerard took it to President Gottlieb who read it and instructed Jerard to verify the claim of the union.

The superintendent went to the tool room, called the toolmakers together, and stated that he had received the letter which he held in his hand, and that he would like to know if the union represented them. Giannini, Arthur Jerard, Romano and Schmidt each answered in the affirmative. Kapustka knew nothing about the matter. The superintendent knew that Melohn was already a member of the union. He then sent Melohn and Kapustka back to their work benches at the other end of the tool room, and, addressing himself to the four employees, said that he was rather surprised upon receiving the letter to learn that there was any dissatisfaction or any unrest in the tool room, that the men had been with him for quite a while and he was surprised that they did not come to him if they had any problem. He mentioned that he had trained them from their beginning days in apprenticeship, and that

they were coming along very fine, and that if they had any problem they should come in and tell him about it, that the door was always open, and they could talk to him at any time they had a problem. He reminded the employees they were already receiving paid vacations, paid holidays, life and hospitalization insurance, free coffee at lunchtime, and salaries commensurate with their ability. He also reminded them of his previous conversation of about a month and a half or two months previously when he had told them that business was slow and that the company was going to take on an outside job, even though it might cause a loss, and that it was being done to keep the fellows in the tool room busy.

On the afternoon of May 15, while Superintendent Jerard was in the tool room, Romano told him that "the fellows had all talked it over and they decided they didn't want to have any part of the union," to which the superintendent replied, "That is up to you to decide." That evening Romano, Schmidt, and Arthur Jerard, at their respective homes, prepared letters of withdrawal which were sent to the union. On May 16 Giannini sent a similar letter to the union which he had prepared at his home. These letters were written without aid, dictation, or assistance from the company. These men testified that no one helped them write the letters, and that no official of the company had requested that such letters be written. Arthur Jerard testified, in answer to a question as to why he withdrew from the union, "Like it states in the letter I stated I didn't believe it could benefit me by joining the union. I had everything I could have gotten—hospitalization, paid vacations, paid holidays, bonus at Christmastime, and I had a nice job." About May 17 Romano advised the superintendent that the fellows had all withdrawn their applications for union membership.

The trial examiner found that under the circumstances the company's refusal to bargain was not a violation of Sec. 8(a)(5) of the Act. The Board reached a contrary conclusion and held there was a violation of both Sec. 8(a)(5) and Sec. 8(a)(1).

The entire case against the company is based upon the few remarks of the superintendent at the meeting in the tool room on the morning of May 15. We must consider these remarks in the light of the company's background and attitude toward union activities by their employees. We also keep in mind that the burden is on the Board to prove affirmatively and by substantial evidence the facts which it asserts. National Labor Relations Board v. Reynolds Intern. Pen Co., 7 Cir., 162 F.2d 680, 690.

The superintendent did not threaten to close the tool room. The Board seems to have relied, in part at least, on the statement he made to the tool room employees about six weeks prior to any union activity in the shop, about the advantage to the company if it had not chosen to keep the tool room operating even at a loss. Considering the time and circumstances under which that statement was made, there is no substantial evidence in the record before us that the company threatened to close its tool room because of union activities of the tool room employees.

The company had no anti-union background. There was no pattern of conduct hostile to unionism. In hiring employees the company had never discriminated against union members and it had never discharged any employee for union activity. No promise of favor or benefit was made to any of the tool room employees as an inducement for them to withdraw from the union.

We quote from Sax v. National Labor Relations Board, 7 Cir., 171 F.2d 769, 772: "* * * Stone asked Patton whether she was 'for the union,' and upon Patton's response that she was Stone further questioned Patton as to her reasons therefor. * * * when Lucy Arnold and Dorothy Blanks sought to return to their jobs, Stone asked them why they had signed union cards. * * * Stone also asked Dorothy Blanks, 'Why didn't you come to us if you wanted to

have a union?" Forelady Lynn admittedly addressed a similar question to Goldie Russell * * *." Stone was the production supervisor and on such facts this court said, 171 F.2d at pages 772, 773: "Such perfunctory, innocuous remarks and queries, standing alone as they do in this case, are insufficient to support a finding of a violation of Section 8(1). They come instead within the protection of free speech protected by the First Amendment to the Federal Constitution. * * * Mere words of interrogation or perfunctory remarks not threatening or intimidating in themselves made by an employer with no anti-union background and not associated as a part of a pattern or course of conduct hostile to unionism or as part of espionage upon employees cannot, standing naked and alone, support a finding of a violation of Section 8(1)."

In John S. Barnes Corp. v. National Labor Relations Board, 7 Cir., 190 F.2d 127, at page 130, where the company had no anti-union background or pattern of conduct hostile to unionism, this court said: "However, the courts have not considered isolated remarks or questions, which did not in themselves contain threats or promises, and where there was no pattern or background of union hostility, as coercion of the employees and as a violation of § 8(a)(1)."

In National Labor Relations Board v. Arthur Winer, Inc., 7 Cir., 194 F.2d 370, 371, the company president had called employees into his office. He used such terms as "how the girls felt about the union" and "what the union had to offer," and asked, "what was going on"? In addition, one employee who received an invitation to a union meeting asked the employer whether she should attend, and was told to do so and see what the union was offering and report. In that case there were no statements derogatory of the union and no threats against employees for union activities. This court, relying on such decisions as the Sax and Barnes cases, supra, refused to enforce the order of the Board.

Considering the record as a whole, it fails to reveal substantial evidence to show that the company committed unfair labor practices in violation of Sec. 8(a)(1). The Board's finding that the company refused to bargain in violation of Sec. 8(a)(5) was based in turn on its finding that the company had violated Sec. 8(a)(1). They fall together. As there is no basis in the record before us for the order of the Board, the enforcement of said order is denied.