**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**M. J. McCARTHY MOTOR SALES CO., Respondent.**

**No. 13747.**

United States Court of Appeals Seventh Circuit.

Nov. 23, 1962.

After a review of the record, we are convinced that the order should be enforced.

Respondent is engaged in retail sale of new and used automobiles. Early in April, 1961, two of the Company's salesmen undertook to organize its new and used car salesmen. A constitution for the proposed union was prepared and ratified and membership cards printed and distributed. By April 18, 1961, ten of the Company's thirteen salesmen had joined the union.

On April 18, 1961, the Union advised the Company of its majority status and requested the Company to bargain with it as the representative of its sales employees. The Company answered by saying that it did not believe the Union represented the salesmen for "collective bargaining purposes." In a second letter on April 27 the Union repeated its earlier request and listed all of its elected officers, all of whom were employed by the Company as automobile salesmen. Receiving no reply, the Union wrote a third letter in which it suggested that a neutral party be designated to check signatures on the membership cards and thus establish the majority status of the Union. The Company ignored this proposal and persisted in its refusal to bargain with the Union.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Seymour Strongin, Atty., Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marion Griffin, Atty., N. L. R. B., Washington, D. C., for petitioner.

Frederick W. Turner, Jr., Murray B. Woolley, Chicago, Ill., for respondent.

Before DUFFY, SWYGERT, and MAJOR, Circuit Judges.

SWYGERT, Circuit Judge.

This is a petition for enforcement of an order of the National Labor Relations Board directing the respondent, M. J. McCarthy Motor Sales Co., of Chicago, to cease and desist from certain unfair labor practices; to offer full reinstatement and make financially whole four former employees found to have been discriminatorily discharged because of their union activities; and to post the usual notices.

The Trial Examiner and the Board concluded that the salesmen constituted an appropriate unit for collective bargaining purposes and that the Union represented a majority of the salesmen. The record reveals nothing unusual about the duties of these new and used car salesmen which would render inappropriate their traditional inclusion in one unit. See Weaver-Beatty Motor Co., 112 N.L.R.B. 60 (1955). On the contrary, the evidence supports the integration of the new and used car salesmen here, for the used car salesmen sell new cars on occasion, and the new car salesmen sometimes cover the used car lot which is nearby the new car showroom. Certainly the Board's determination that the new and used car salesmen constituted an appropriate unit was neither arbitrary nor capricious. N. L. R. B. v. Packard Motor

Car Co., 330 U.S. 485, 491–492, 67 S.Ct. 789, 91 L.Ed. 1040 (1947).

■ We agree with the Trial Examiner's view, adopted by the Board, that the Company's refusal to bargain with the Union was a violation of Section 8 (a) (5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a) (5) and (1). The record is devoid of any evidence that would justify our holding that the Company had a good faith doubt of the appropriate unit or of the Union's majority position.

■ The Company, after learning of the Union's organizational activity, began a campaign of harassment of those employees who had joined the Union. The employees were quizzed as to their Union membership, and less-than-subtle threats of impending dire consequences should they remain in the Union were made by Company officials. Long established benefits, such as fixed weekly salaries that supplemented their commissions, free use of company automobiles, and use of semi-private office facilities, were denied Union adherents, and on the other hand, favorable treatment and privileges were accorded those who renounced their union membership. All this occurred while the Company was refusing to bargain with the Union. While we agree with the Company that an employer has the right to interrogate its employees in order to ascertain majority status of a union, it may not do this when the interrogation is conducted in a coercive atmosphere. N. L. R. B. v. Kropp Forge Co., 178 F.2d 822, 827–829 (7th Cir., 1950), cert. denied, 340 U.S. 810, 71 S.Ct. 36, 95 L.Ed. 595 (1950). The record shows a flagrant violation of Section 8(a) (1) of the Act on the part of the Company.

Soon after learning about the organizational campaign of the Union, the Company discharged four of the Union's members. The Company argues that it had legitimate grounds for firing each of them, but the strength of this argument fades before the facts and the overwhelming evidence of its anti-union bias. Merlin Griffith, the co-founder and newly elected president of the Union, was discharged allegedly because the Company found that a bonding company refused to grant coverage for him. Griffith had handled thousands of dollars for the Company over a period of two years without incident and the Company made no attempt to secure coverage elsewhere or to seek a reinvestigation of Griffith as it had done earlier with respect to another employee's bond rejection.

James Marzano was employed by respondent for seven months, was a good worker, and had been complimented for his work by the general sales manager. Respondent had knowledge of Marzano's union membership and the general sales manager threatened him with blackballing because of his union affiliation and deprived him of further use of a company car and his $50 fixed weekly salary. He was discharged ostensibly for being late for work. No inquiry was made as to why he was late (the actual reason being an illness in the family) and the sales manager testified that he had no hard and fast rule about absences since "the best way to get salesmen to sell was to give them a certain amount of freedom."

Walter Zion had worked as a new car salesman for the Company for some four years prior to his discharge. His name appeared as the Union's vice-president on its April 27 letter requesting recognition. Although he was one of respondent's top salesmen he was discharged on April 28. The only reason given was that he had been guilty of "back stabbing."

Leonard Pechtold, secretary and treasurer of the Union, was employed by respondent in the used car department as salesman, with intermittent periods as sales manager, for four and one-half years until he was discharged on June 12, 1961, for the stated reason that he reported for work about forty-five minutes or an hour late. On June 12, employees Pechtold and Gardzulas arrived at the sales lot about 10:00 a. m. Upon their arrival the company's general manager discharged Pechtold, allegedly for tardiness, but took no action against Gardzulas who, like Pechtold, had been

reprimanded the preceding Saturday for arriving after 9:00 a. m.

On the basis of the foregoing facts, the Board concluded that the four discharged employees "were not discharged for the reasons assigned but because of their union adherence and leadership." The Board found that the Company's actions constituted a violation of Section 8(a) (3) and (1) of the Act, 29 U.S.C. § 158(a) (3) and (1). See Sunshine Biscuits, Inc. v. N. L. R. B., 274 F.2d 738, 741–742 (7th Cir., 1960).

We believe the evidence, considered as a whole, fully supports the Board's determinations.

The Board's request for enforcement of its order is granted.