**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**The BEDFORD-NUGENT CORP., Respondent.**

No. 13920.

United States Court of Appeals Seventh Circuit.

May 29, 1963.

---

862

Marcel Mallet-Prevost, Asst. Gen. Counsel, Joseph C. Thackery, Atty. N. L. R. B., Washington, D. C., for petitioner.

Harry P. Dees, Evansville, Ind., Arthur R. Donovan, Isidor Kahn, Evansville, Ind., for respondent, The Bedford-Nugent Corp., Kahn, Dees, Donovan & Kahn, Evansville, Ind., of counsel.

Before HASTINGS, Chief Judge, KNOCH, and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

The National Labor Relations Board requests enforcement of its order issued against respondent The Bedford-Nugent Corp., an Indiana corporation which engages in extracting river sand and gravel and preparing it for commercial purposes. Respondent's principal place of business is Evansville, Indiana. It operates plants in Evansville and Rockport, Indiana, and in Henderson, Kentucky.

The Board's decision and order are reported at 137 N.L.R.B. No. 110. The Board found that Bedford-Nugent violated Section 8(a) (1) of the National Labor Relations Act (29 U.S.C. § 158(a) (1)) by interfering with, restraining and coercing its employees in the exercise of their rights under Section 7 of the Act; that the Company also had engaged in unfair labor practices within the

meaning of Section 8(a) (5) of the Act (29 U.S.C. § 158(a) (5)) by failing to recognize and collectively bargain with Local Union 215, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, as the exclusive representative of its employees. The material facts follow.

The Union began to pass out authorization cards among the employees of the Company about September 19, 1961. Between September 19 and 25, Company vice-president James L. Nugent, Jr. learned from various employees that the Union was organizing. He thereupon visited the Company's Rockport, Indiana, plant where he asked employee Gordon if "anybody had been up there to try to get anybody to sign a union card.'" When Gordon said "no" he asked Gordon to telephone him collect if he "heard anything" about the Union, because, as he testified, he "had to ascertain who had not signed a (union) card and who had." At least five employees either telephoned or informed Nugent directly as to who had signed cards.

On Monday morning, September 25, the Company's superintendent Jack Land interrogated several employees at the Evansville plant. At noon that day he spoke to an assembly of most of them on a derrick boat near the plant. He asked the employees "how far along" the organizational attempt was, who had "helped" with it, and whether there was "any way (the Company) could get around" the Union. He also asked what the employees "had in mind" about a wage increase. On this same day, the Company announced and put into effect a five percent wage increase for all employees whose wages had not been increased as a result of the minimum wage law amendments of September 3, 1959.

In the afternoon of September 25, the Union sent the Company a telegram in which it claimed majority status, set forth the unit it deemed appropriate, demanded recognition, and a meeting to negotiate a contract and offered to prove majority in any mutually acceptable way.

The Company replied by telegram dated the same day:

We accept your invitation to have the National Labor Relations Board conduct an election so it can be determined whether or not your union represents majority of the employees in a collective bargaining unit.

The next morning, September 26, Union president Clifford Arden advised the Company's attorneys that the Union represented a majority and desired recognition. Counsel replied that the Company would "call back." At 11:00 a.m. James L. Nugent, Sr., president of the Company, did so asking Arden why there was a union representative outside the plant. Arden replied that he did not know but that he would be right down to the plant to discuss the matter further. A short while later, and while at the plant, Nugent, Sr. asked Arden "who was starting all this Hitler stuff." Nugent also said he would "never recognize the union until I call each and every one of these employees in my office and they personally tell me they signed that card, and why they belong to a union."

That same day as the employees were leaving the plant for lunch, Arden told them what Nugent, Sr. had said. The employees thereupon held a vote and decided not to return to work. They immediately went on strike; about forty-five joining in the picketing. At 3:23 p.m. the Company received the following telegram from the Union:

Upon receipt of this telegram please let us know when and where you can meet with us for purpose of negotiating labor agreement in re wages and working conditions.

The Company did not reply

On September 27, the Evansville strike spread to the Company's Rockport and Henderson plants. On September 28, Nugent, Jr., after photographing the pickets at Rockport, assembled the employees and told them he would "not have a union;" that he would "sell first or close down," or "move up the Green River."

During the strike, superintendent Land asked Clay Damrath, a picketing derrick operator, to go back to work. When Damrath refused, Land told him he would not be taken back to work after the strike. The Union filed a representation petition on October 2, which the Board dismissed because of its policy of not processing representation cases during the pendency of charges alleging refusal to bargain.

On October 6, the Company acknowledged receipt of the Union's September 26 telegram. The Company stated that it "has a good faith doubt as to the majority status of your union * * * [and] as to the appropriateness of the union described by you." On October 10, the Union wrote the Company characterizing the latter's professed doubt of majority and appropriateness of unit as devices of "delay." On October 11, the Company replied again refusing recognition, but agreeing to the appropriateness of the unit. Subsequent requests for recognition by the Union were met with repeated refusals.

■ We agree with the Board that the record when considered as a whole shows that respondent violated Section 8(a) (1) of the Act. While we recognize the Company's reliance on our decision in National Labor Relations Board v. D. Gottlieb & Co., 208 F.2d 682 (7th Cir. 1953), and cases cited therein, wherein we stated that "perfunctory, innocuous remarks and queries, standing alone" are insufficient to support a finding of an 8(a) (1) violation, we are unwilling to say that the statements and actions attributed to the Company's officers and supervisors were either innocuous or properly read only in isolation from the totality of acts of the Company. See Medo Photo Supply Corp. v. N. L. R. B., 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); International Association of Machinists, etc. v. N. L. R. B., 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50; (1940); N. L. R. B. v. Wagner Iron Works, 220 F.2d 126 (7th Cir. 1955), cert. den. 350 U.S. 981, 76 S.Ct. 466, 100 L.Ed. 850; N. L. R. B. v. Epstein et al., 203 F.2d 482 (3rd Cir. 1953), cert. den., 347 U.S. 912, 74 S.Ct. 474, 98 L.Ed. 1068; Indiana Metal Products Corp. v. N. L. R. B., 202 F.2d 613 (7th Cir. 1953); N. L. R. B. v. Bradley Washfountain Co., 192 F.2d 144 (7th Cir.1951); N. L. R. B. v. Aintree Corporation, 132 F.2d 469 (7th Cir. 1942), cert. den., 318 U.S. 774, 63 S.Ct. 831, 87 L.Ed. 1144. The net effect of the Company's conduct could very well have been to interfere with, restrain or coerce its employees in the exercise of their organizational rights under the Act.

■ We cannot, however, agree with the Board that substantial evidence, when the record is considered in its totality, supports its determination that the Company violated Section 8(a) (5) of the Act. The Board concedes that where, at the time request for recognition is made, the employer has a good faith doubt of the union's majority, it may refuse the union's request for recognition without violating Section 8(a) (5). National Labor Relations Board v. Dan River Mills, 274 F.2d 381 (5th Cir. 1960). At least it may withhold recognition until the union's claims are established by a Board-conducted election. The only limitation on this right is that there be a *good faith* doubt on the part of the employer, that is, the employer may not merely use its denial of recognition as a subterfuge for delay or to gain time in which to undermine the union or dissipate its majority. N. L. R. B. v. Taitel, 261 F.2d 1 (7th Cir. 1958), cert. den., 359 U.S. 944, 79 S.Ct. 725, 3 L.Ed.2d 677; N. L. R. B. v. Jackson Press, 201 F.2d 541 (7th Cir. 1953).

It is important in evaluating the existence of good faith in this case that the time element be considered. According to the Board's own findings, not more than eight days expired between the time when the Union started its solicitation and when the Company, previously ununionized and with no anti-union history, experienced a Union inspired strike. Added to this is the fact that on September 26, at the time Union president Arden made his request for recognition, the Union did not in fact have authoriza-

tion cards from a majority of the employees. The good faith of the Company must be viewed in the light of the rapidity with which the events developed.

Parenthetically, it may be noted that the Company sought to introduce evidence of Union coercion of employees in obtaining authorization cards, but this line of evidence was excluded by the trial examiner. We agree with the Board that one of the best ways to determine coercion of an employee is an examination of the employee himself; however, when good faith of the employer is the issue, evidence known to the employer that the union is employing strong-arm tactics or threats on *any* of the Company's employees seems to us to be relevant. Certainly, the employer is not charged with clairvoyance at the time of the request for recognition in being able to discern just which employees have been threatened or coerced by the union. An uncoerced majority is a prerequisite to recognition. N. L. R. B. v. James Thompson & Co., Inc., 208 F.2d 743 (2nd Cir. 1953).

In the instant case the respondent's belief (not frivolous) [1] that the Union had threatened employees, coupled with the fact that the Union did not have a majority when the first demand for recognition was made, and the brief span of time in which the Union's "blitz" organization campaign took place, all combine to establish the Company's claim of a good faith doubt of majority status.

We cannot agree that the record as a whole supports the Board's conclusion that the Company was guilty of a Section 8(a) (5) violation.

The order of the Board will be enforced except that portion which directs respondent to bargain collectively with the charging Union. The notices to be posted by respondent, the form of which is attached as "Appendix" to the order, will be modified to conform with the revised order.

1. That the Company's belief that employees were being coerced was not frivolous is supported by another Board decision growing out of this same labor controversy. Though the conduct complained of therein took place after the start of the strike, we take judicial notice of it in view of the exclusion of testimony in the instant proceeding tending to show the methods and tactics of the Union organizers.

In 137 NLRB No. 67, Case No. 25–CB–473, June 11, 1962, reported in 1962 CCH NLRB Decisions ¶ 11,307, the Board adopted facts and findings:

The Trial Examiner concluded that in the course of a strike against the employer, the union unlawfully restrained and coerced its employees in the exercise of the rights guaranteed them by the Act, when the union by its agent threw and placed nails and tacks on the highways and driveways leading to the employer's plant, fired pellets from an air pistol at the employers' and customers' trucks driven by their employees when they entered the employer's premises, and finally, damaged the automobile of an employee who crossed the picket line and worked during the strike.