NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

CHICAGO PERFORATING COMPANY,
Respondent.

No. 14858.

United States Court of Appeals
Seventh Circuit.

May 17, 1965.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Elliott C. Lichtman, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Warren M. Davison, Atty., National Labor Relations Board, Washington, D. C., for petitioner.

Matthew E. Murray, John D. O'Brien, Charles J. Griffin, Jr., Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for respondent.

Before HASTINGS, Chief Judge, and DUFFY and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

This case is here upon petition of the National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, as amended (61 Stat. 136, 73 Stat. 519, 29 U.S.C.A. § 151 et seq.), for enforcement of its order issued June 22, 1964, against respondent, Chicago Perforating Company. The Board's decision and order are reported at 147 NLRB No. 75.

Respondent, with its principal office and place of business in Chicago, Illinois, is engaged in the manufacture and sale of perforated screening. During the period in controversy James H. Finlay, Sr. was respondent's president, William Dryzyga its secretary, James H. Finlay, Jr. its sales manager, and Joseph Malinowski a foreman.

The complaint, charging respondent with unfair labor practices, was filed July 17, 1963, by the Amalgamated Industrial Union, Local No. 44 (hereafter referred to as the union). It is conceded that the Board has jurisdiction and that the union is a labor organization within the terms of the Act. A Trial Examiner, following a hearing, issued a decision in which he found that respondent violated Sec. 8(a) (1) by interrogating its employees concerning their union activities and by threatening them with reprisals for their union adherence. He also found that respondent violated Sec. 8(a) (3) and (1) by discriminatorily discharging employee William Hubbard.[1] On June 22, 1964, the Board issued its decision and order adopting the Examiner's decision.

As a prelude to our discussion of the facts, we note that respondent at the time of the events giving rise to this controversy was a small company with eighteen employees, and that for the preceding year had a net profit of $5,000. While the employees had been without union representation, there is no evidence, not even an intimation, of any union hostility on respondent's part prior to May 18, 1963. On that date employee William Hubbard contacted Frank Jur, president of the union, and informed him that employees were dissatisfied with their working conditions and desired to be represented by a union. Hubbard circulated union authorization cards among the employees, explaining their purpose and soliciting signatures. In all, Hubbard obtained signed cards from some ten or eleven of respondent's eighteen employees. On May 27, 1963, Jur, in a telephone conversation, informed William Dryzyga that the union represented a majority of the employees and requested a meeting with management to discuss recognition. Dryzyga expressed doubt that a majority of the employees desired a union and referred Jur to the company's attorney. He also told Jur that if the men desired a union "they are welcome to it." On the same day, the union filed a representation petition with the Board, seeking an election among respondent's employees.

The sole issue here arises from respondent's contention that the Board's order as it relates to unfair labor practices is not supported on the record as a whole by substantial evidence. Its finding of an 8(a) (1) violation is predicated upon the interrogation by respondent's officials of certain employees and statements made incidental thereto. The Board reasoned and argues here that such interrogation and statements "interfered with, restrained and coerced" respondent's employees.

We utilize a statement contained in the Board's brief relative to this phase of the case which is as favorable to it, and perhaps more so, than the record justifies. On May 27,[2] after learning of the union's claim of majority status, respondent's supervisory personnel interrogated five of its employees. James H. Finlay, Sr. asked Hubbard whether he had signed a union card and whether there had been a union where he had previously worked. Hubbard responded in the negative to both inquiries and Finlay stated, "Good for you." Finlay, Jr. asked Bartolomei whether he had signed a union card, and he responded that he had. Finlay, Jr., also asked Willie Williams whether he had signed a union card, to which Williams replied that he had never worked for a union and did not know the value

---

1. The Examiner dismissed charges that respondent discriminatorily discharged or laid off employees James L. Jones, Willie Williams and Walter Sadowski.

2. This was the date on which Jur notified respondent that a majority of its employees had designated the union, and also the date on which the union filed its petition with the Board for an election.

of it. Williams also stated in response to a question that he did not know whether there had been a union at the place he had previously been employed. Dryzyga interrogated Robinson at the latter's work station, asking whether he had signed a union card and, if so, why. Robinson said that he had and that he had done so because a majority of the employees felt they needed a union and he had decided to go along with the majority. Dryzyga then asked Robinson if he would jump in a lake if everyone else did. When Robinson said, "No, but we need one here," Dryzyga responded, "Well, we don't need one here." Dryzyga interrogated Sadowski in a similar manner and the latter admitted that he had signed a union card. Dryzyga then asked what Sadowski thought the union would do for him, to which the employee replied that he had been a union member for some fifteen years and that the union had made his prior place of employment "a wonderful place to work." Sadowski added that he hoped the same thing would happen here, to which Dryzyga replied, "Well, if the union gets in, we'll see if the union will get you a job."

Sadowski testified that on May 28 he overheard Dryzyga tell employee Knox that "with this union in" the employees would not get any more money.[3] About a month later, on June 27, Williams, a temporary employee, spoke to Dryzyga about the likelihood of securing a regular job. He testified that Dryzyga stated, "Well, I can't make no promises until after I see what you guys are going to do about this union," and "But, if the union comes in, if the guys want to put my back against the wall, then the hell with them."

Dryzyga testified that he made no statement or suggestion to any employee that there "might be consequences if the union got in," that his interrogation of the employees was for the purpose of ascertaining if a majority wanted the union and,

further, that he "only answered the questions that they asked me."

In determining whether the Board's findings as they relate to a violation of Sec. 8(a) (1) are substantially supported, we are not unmindful, of course, of the statutory admonition, "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." Sec. 10(e). Even so, it is the function of a reviewing court to determine whether the evidence relied upon is substantial. As the Court stated in Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456, "* * * a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."

In our judgment, the Board's finding relative to this facet of the case is clearly without substantial support. The most it shows is that respondent, when suddenly confronted with a demand by the union for recognition, was much concerned. Its interrogations of Hubbard, Bartolomei and Williams were entirely innocuous. The statements made to Robinson, Sadowski, and a month later to Williams, were nothing more than an expression of opinion (see 8(c) of the Act), and form no basis for a finding of interference, restraint or coercion in violation of 8(a) (1). It is interesting to note, although perhaps immaterial as the Board suggests, that following the alleged threats, intimidation and coercive statements on the part of respondent, its employees in the election voted fifteen for the union and three against.

We think it of little, if any, benefit to discuss the numerous cases relied upon by the parties relative to the issue under

3. This testimony is entitled to little, if any, weight. The witness professed to have heard the statement, notwithstanding the noise made by his machine. More than that, Knox, to whom the statement purportedly was made, for some reason unexplained was not called as a witness.

discussion. This is so because each decision turns upon the particular facts of the case. Cases from this Circuit relied upon by the Board, when the facts are compared with those here, furnish no support for the Board's contention. Reference to two of such cases will suffice. N. L. R. B. v. M. J. McCarthy Motor Sales Co., 7 Cir., 309 F.2d 732, and N. L. R. B. v. Larry Faul Oldsmobile Co., Inc., 7 Cir., 316 F.2d 595.

In McCarthy, we subscribed to the general rule that an employer has the right to interrogate its employees for the purpose of ascertaining their union membership, providing the interrogation is not conducted in a coercive manner. We refused, however, to accord the employer the benefit of this principle in view of the record which disclosed that it immediately discharged a number of employees upon learning that they were active in the union movement. Other punitive measures were imposed which were clearly threatening and coercive in their nature.

In Faul, we declined to order enforcement of the Board's order based upon the employer's interrogation of its employees made for the purpose of ascertaining if they were members of the union. In doing so we stated (page 597), "We do not find here a 'campaign of harassment' which was present in N. L. R. B. v. M. J. McCarthy Motor Sales Co., 7 Cir., 309 F.2d 732 (1962)."

Neither was there such a campaign in the instant case. On the contrary, while respondent evidently was surprised and perhaps displeased with the prospect of a union in its small plant, operating at little profit, there is no suggestion of anti-union background, that it failed to co-operate in the conduct of the election or that it failed to acquiesce in the result and recognize the union as the bargaining agent for its employees.

In N. L. R. B. v. Firedoor Corp. of America, 2 Cir., 291 F.2d 328, 331, the rule under discussion is stated, "Interrogation of employees is legal, when the questioning is not accompanied by any explicit threats, cf. N. L. R. B. v. Beaner [Beaver] Meadow Creamery, 3 Cir., 1954, 215 F.2d 247, if under all the circumstances coercion is not implicit in the questioning. [Citing many cases.]"

The interrogation in the instant case was not accompanied by explicit threats and coercion was not implicit in the questioning. The Board's inference to the contrary cannot stand. In fact, when the record is considered as a whole, any inference on this score is entirely dissipated.

On July 3, 1963, employee Hubbard was given written notice of his discharge. The decision to do so was reached by Finlay, Sr., respondent's president, and Dryzyga, its secretary. The notice was in the form of a letter signed by Finlay, Sr.[4] and delivered to Hubbard by Dryzyga, a copy of which was sent to the union.

■ Following a tortuous process of reasoning the Examiner found and concluded that Hubbard's discharge was not for good cause, as contended by respondent, but was in retaliation for his prominent role in bringing the union into the plant and constituted a violation of 8(a) (3). In the first place, there is not a scintilla of direct proof that respondent had knowledge that Hubbard had been "the driving force behind the union's success-

---

4. "I have just received a very serious complaint from one of our most valued customers on unsatisfactory work done by you on stainless steel sheets involving a substantial sum of money. I have reviewed your performance record and find that on your machine there has been excessive scrap and sub-standard performance over a considerable period of time. I also find that you were once discharged for unsatisfactory performance on this machine, but as a result of your promises to improve your work, you were taken back and given another chance. Complaints have also come to me about your irregular hours and excessive absenteeism which you have been guilty of in the past. In addition to this, on my return to the plant yesterday, I found you had ruined another plate of stainless steel as a result of sub-standard work.

"Under the circumstances I have no alternative but to discharge you from this company, effective 4:30 PM July 3, 1963."

ful organizational effort," as stated by the Board. True, as previously shown, Hubbard informed union president Jur that the employees desired to be represented by the union and circulated authorization cards. Also, Jur in a telephone conversation, without mentioning Hubbard's name, informed respondent that the union represented the employees. The Board in effect concedes that respondent at this point was without knowledge of Hubbard's union activity.

The Examiner's propensity for drawing any inference thought necessary is aptly illustrated by a statement from his decision, "It appears reasonable to infer that Respondent had knowledge of Hubbard's efforts in behalf of the Union. This is predicated on the smallness of the plant (18 employees in the unit) and the fact that there was no apparent attempt to conceal union activities and adherence, as indicated by employees' willingness to admit that they had signed union cards when interrogated (except for Hubbard and probably Williams)." How respondent could be charged with knowledge that Hubbard rather than some other employee was the leader of the union movement merely because of "the smallness of the plant" is beyond our comprehension. The absurdity of this inference is accentuated when it is kept in mind that Hubbard had expressly told respondent that he had not signed a union card and that there had been no union where he had previously worked.

This inference is sought to be bolstered by Dryzyga's statement to Jur after Dryzyga had been told that Hubbard had been selected by the union as an election observer, "You sure picked the right guy." This statement, in our view, adds nothing to the strength of the inference. The Board's finding that respondent had knowledge that Hubbard had been "the driving force behind the union's successful organizational effort" rests on speculation and guess, nothing more. Assuming to the contrary, however, it does not follow that Hubbard was discharged for that reason.

We shall make no attempt to relate or discuss in detail the evidence relative to Hubbard's discharge. The reasons assigned by respondent, as stated in its letter to Hubbard, are fully supported by the proof. That respondent had good cause to discharge Hubbard is not disputed; in fact, the Board in its brief, in connection with its contention that the discharge was discriminatory, states, "This is not to say, of course, that respondent could not have discharged Hubbard for any or all of the reasons asserted."

Hubbard was employed by respondent as a railroad press operator on December 4, 1962, and his record from the beginning is replete with a consistently unsatisfactory rate of production, excessive absenteeism, tardiness and irregular hours. On one occasion he was dismissed, but later permitted to return to work upon his promise to do better. In short, he was a highly unsatisfactory employee and it is remarkable that respondent tolerated him as long as it did.

Hubbard's careless, indifferent and uncooperative record continued in the same groove during the week between the election and the date of his discharge. The gist of the Trial Examiner's reasoning appears to be that because respondent tolerated and excused Hubbard's shortcomings prior to the advent of the union, it must afterwards accord him the same treatment under penalty of being charged with discrimination. On June 28, 1963, the day after the election, he reported for work an hour and forty-five minutes late. During that week respondent received complaints from two customers, Chicago Steel Service Company and United States Steel and Pipe Company, that sheets of stainless steel received by them from respondent were defective because of careless cross-turning by Hubbard. On July 2, respondent's foreman discovered another instance of improper cross-turning by Hubbard and reported the fact to Dryzyga. These sheets of stainless steel had to be replaced or rewelded at considerable expense. It was the next day after this July 2 incident

that Dryzyga and James H. Finlay, Sr. reviewed Hubbard's record and made the decision to discharge him.

Relative to the July 2 incident, the Board in its brief states, "There can be no question but that Hubbard ruined a sheet of stainless steel a day or two before he was fired." This dereliction is brushed aside on the flimsy premise that such mistakes by other employees were not uncommon. If this constitutes a valid excuse, which we doubt, it has no factual basis other than the testimony of Hubbard who, when pressed on cross-examination, could name only one employee other than himself who had made such a mistake but was unable to state any of the circumstances relative thereto.

Hubbard testified that at the time he received the discharge letter from Dryzyga (previously set forth), the latter stated, "Here, take this, take everything you have here so that you won't ever have to come back, and get the hell out. We don't want the likes of you around here any more." The Board in its brief, referring to this statement, states that the bitterness and animosity exhibited by Dryzyga when he fired Hubbard "is more consistent with a discharge in retaliation for union activity than a discharge of an employee with whose performance management was dissatisfied." [5] While Dryzyga's statement can hardly be characterized as a pleasant farewell message, it is not, in view of the record, susceptible of the interpretation which the Board places upon it. It is far more reasonable to conclude that the statement was made as a result of respondent's exasperation with Hubbard's derelictions over a long period.

The Board cites cases of this Court, N. L. R. B. v. Symons Mfg. Co., 7 Cir., 328 F.2d 835, 837, and N. L. R. B. v. The Howe Scale Co., 7 Cir., 311 F.2d 502, 505, in support of the rule that the mere existence of valid grounds for discharge is no defense to a violation of Sec. 8(a) (3), unless the discharge was solely on those grounds. Admittedly, respondent had valid grounds to discharge Hubbard, and the rule is of no benefit to the Board on the facts of the case. The burden was upon the Board to prove that his discharge was because of his union activities. This it failed to do. For a case much in point on the facts see N.L.R.B. v. Rickel Bros., Inc., 3 Cir., 290 F.2d 611, 613–614.

We have carefully reviewed the entire record and have no doubt but that the unfair labor practices found by the Examiner and adopted by the Board, as well as the conclusions based thereon, are without substantial support. It follows that petition for enforcement of its order must be denied. It is so ordered.

---

5. The Board in support of this reasoning cites Sunshine Biscuits, Inc. v. N. L. R. B., 7 Cir., 274 F.2d 738, 742. In that case the employer had conducted an active anti-union campaign, had told its employees that no union would be tolerated and that the services of those who participated would be dispensed with. No such situation is shown here.