**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**C. J. GLASGOW COMPANY, Respondent.**

**INTERNATIONAL UNION, UNITED AU-
TOMOBILE, AEROSPACE AND AGRI-
CULTURAL IMPLEMENT WORKERS
OF AMERICA, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

**Nos. 14960, 14999.**

United States Court of Appeals
Seventh Circuit.

Feb. 15, 1966.

Schnackenberg, Circuit Judge, dissented in part.

Henry H. Sills, Detroit, Mich., Irving M. Friedman, Chicago, Ill. for C. J. Glasgow Co.

Harold A. Katz, Bruce S. Feldacker, Chicago, Ill., for Petitioner, International Union, United Automobile Aerospace and Agricultural Implement Workers of America AFL–CIO.; Stephen I. Schlossberg, Detroit, Mich., of counsel.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Elliott C. Lichtman, Attorney N. L. R. B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Elliott Moore, Attorney, N. L. R. B., for N. L. R. B.

Before SCHNACKENBERG, CASTLE and KILEY, Circuit Judges.

CASTLE, Circuit Judge.

These consolidated cases are before the Court upon the petition of the Union [1] (No. 14999) to review an order of the National Labor Relations Board insofar as it dismisses a portion of the complaint initiated upon the Union's charges against C. J. Glasgow Company, and upon the Board's petition (No. 14960) to enforce the remainder of its order against the respondent Company. The Board's decision and order are reported at 148 NLRB No. 13.

The Board found and concluded that the Company violated Section 8(a) (5) and (1) of the National Labor Relations Act by refusing to bargain collectively with the Union; that the Company violated Section 8(a) (1) of the Act by unilaterally increasing the wages of numerous employees, by discharging employee Hughes, by making certain statements to the assembled employees and to employee Staton; and that the Company did not violate Section 8(a) (3) of the Act by a layoff of some of its employees for periods from one to two weeks. The Board's order requires the Company to cease and desist from the unfair labor practices found. Affirmatively, the Company is required to bargain with the Union upon request, and to post designated notices.

The record discloses that in early 1962 the Company, a Michigan manufacturer, leased a plant at Dixon, Illinois, for the purpose of fabricating steel shipping containers for the Allison Division of General Motors Corporation. The plant became operational by the end of June but production difficulties were soon encountered. In order to meet Allison's delivery schedules the Company subcontracted part of the work to another manufacturer and filled part of the orders from its plant near Detroit, Michigan.

As the result of an organizational campaign commenced in July the Union, on August 13, 1962,[2] was in the possession of authorization cards signed by 18 of the 32 employees in the unit involved. On that date the Union notified the Company of its claim that it represented a majority of the employees and requested a collective bargaining meeting. The Company made no reply, and on August 16, the Union filed a representation petition with the Board.[3] On August 17, the Company laid off all but nine of its employees, without prior notice. Eleven of the employees were called back after one week, four more two days later, and the remainder after the second week. When all employees had returned on September 4, the Company unilaterally raised the wages of 14 men. On September 10, employee Hughes, a Union adherent who had previously expressed to Walls, a Company supervisor, his preference of the Union over an independent employee organization, was discharged by Kessell, the night-shift foreman, but was reinstated the next day by the Company

---

1. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO.

2. All dates referred to are in 1962.

3. On September 27, the Board ordered a representation election to be held October

23. On October 18, the Company was advised the election was cancelled, the Union's request for withdrawal of its petition having been approved by the Board. The unfair labor practice charges which are the subjects of the Board's order had been filed on October 12.

management without loss of pay. On September 28, the Company president, Glasgow, in a meeting with the employees, recounted some of the history of the Company's operations and referred to the closing of an Adrian, Michigan, plant in which the Company had a part interest asserting that excessive union demands had caused the closing and resulted in the inability of a number of middle-aged employees to find other employment. When one of the assembled employees inquired about the Company's earlier expressed intention to move additional machinery from Detroit to its Dixon plant, Glasglow stated, "that is our plan that was our plan and still is our plan, but I am not stupid enough to close down two plants". On October 20, employee Staton, who was engaged in on-the-job training to become a welder, was advised, in the course of a conversation with Leone, the Company Secretary, that if the Union were to come in Leone did not know if Staton could continue such training unless the Union had an apprenticeship program, and if not he would have to learn welding elsewhere.

The authorization card signed by each of the 18 employees, like those involved in N. L. R. B. v. Peterson Brothers, Inc., 5 Cir., 342 F.2d 221, first recited that the employee authorized the Union to represent him in collective bargaining with the employer. It concluded with a recital that the card "is for use in support of the demand of [the Union] for recognition from the company in your behalf, or for an N. L. R. B. election". The Company, relying on *Peterson*, contends that the alternative use expressed in the concluding recital precipitates an ambiguity which of itself precludes use of the cards as evidencing the Union's attainment of the status of collective bargaining representative for the unit involved absent evidence establishing a subjective intent of the signers to authorize the Union to represent them without an election. The Company additionally . contends that the testimony of three of the eighteen employees whose signed authorization cards were in the

possession of the Union at the time of the August 13 demand upon the Company for recognition and collective bargaining establishes that it was understood that the cards would be used for the purpose of securing an election, and if only the cards of these three employees are disqualified the number of valid cards would be reduced to less than a majority of the thirty-two employees in the unit involved.

■ We do not subscribe to the rationale of *Peterson* insofar as that case may be taken as holding that the recital of the possible alternative uses of the authorization card—either in support of a demand for recognition or for the purpose of obtaining an election—raises such an ambiguity as deprives the plainly expressed authorization to represent the signer in collective bargaining with the employer of its effectiveness absent testimony establishing a subjective intent of the signer to confer such authority without an election. The card expressly confers the requisite authority. The recital of alternative methods by which the card might be used to make the authority granted operative with respect to the employer in our opinion neither negates the grant nor beclouds it with ambiguity.

■ This Court has recognized that if union authorization cards are convincingly shown to have been signed because of a misrepresentation that the purpose of the authorization cards is to obtain a NLRB election, then the cards will not be considered evidence of the union's majority status. N. L. R. B. v. Koehler, 7 Cir., 328 F.2d 770, 773. And, in Happach v. N. L. R. B., 7 Cir., 353 F.2d 629, Chief Judge Hastings, speaking for the majority, held that such misrepresentation does not exist where "the authorization cards were not represented to be for the sole purpose of an election". The employee testimony relied upon by the Company does not establish the existence of such a misrepresentation. None of the three employees upon whose testimony the Company relies stated that it was represented to him, or to others, that the

*sole* purpose of signing the cards was to obtain an election. Their testimony, and that of the Union organizer, merely reveals that at the first meeting of the organizer with the employees procedures, including the petitioning for an election if sufficient signatures were obtained, were discussed. We reject the Company's contention that it is not established by substantial evidence on the record as a whole that the Union in fact represented a majority of the employees on August 13.

■ The Company contends that the record does not support a finding that it unlawfully refused to bargain with the Union. In this connection the Company relies upon the testimony of both Glasgow, the Company president, and Leone, Company Secretary, that they did not believe that the Union had majority representation, and upon the fact that the Union filed a petition for an election. But neither of these factors supports the contention of the Company that a good faith doubt as to majority representation of the Union existed and that the Board's contrary finding lacks support in the record. The testimony of Glasgow and Leone as to their "doubt" reveals nothing with respect to a basis for the doubt. To be "fair" or in "good faith" doubt must have a rational basis in fact. N. L. R. B. v. John S. Swift Company, 7 Cir., 302 F.2d 342, 346. Here there is no evidence of probative value to justify good faith doubt. In addition to its failure to reveal any reason for their "belief" the record discloses no action upon the part of Glasgow, Leone, or any other representative of the Company, to attempt to verify the Union's claim, either through inquiry addressed to the Union or to the employees. The Union's petition for an election afforded no basis for good faith doubt on the part of the Company. The Company's reliance upon N. L. R. B. v. Beford-Nugent Corp., 7 Cir., 317 F.2d 861, in this connection, is misplaced. In that case the Union, at the time of its request for recognition, did not in fact have authorization cards from a majority of the employees (317 F.2d 861, 864–865) and the employer had been informed as to who had signed cards (ibid. 863). And here the filing of the petition for an election did not absolve the Company from its duty to bargain. N. L. R. B. v. Elliott-Williams Co., 7 Cir., 345 F.2d 460, 464.

■ We turn to consideration of the Union's contention that the Board erred in finding that the Company did not violate Section 8(a) (3) of the Act by its August 17 layoff of employees. On this phase of the case we conclude that the record fully substantiates the Board's findings and conclusions and the Board properly dismissed that portion of the complaint relating to the Union's charge concerning the layoff. It is undisputed that the shut-down which occasioned the layoffs was for the purpose of rearranging and installing machinery and experimenting with welding techniques in order to eliminate and overcome the production difficulties which had been encountered and had required subcontracting of work and utilization of the Company's Detroit facilities to produce part of the Allison order. Although the Company had known as early as June that inventory taking at Allison would require cessation of deliveries to Allison from August 22 to September 4, it was not until in August that containers began arriving from the subcontractor and the Company was thereafter able to determine that the current status of production on the Allison order was such that it was in a position to take advantage of the Allison inventory period as an opportune time for necessary rearrangements and improvements at its Dixon plant. The shut-down followed. The choice of men laid off and retained was dictated by seniority and type of skill. We are convinced that the Board's finding that the temporary shut-down was solely for business reasons and unassociated with the organizational activities is substantially supported by the record.

We have examined the record and considered the contentions made by the re-

480 .

spective parties relative to the remaining findings and conclusions contained in the Board's decision and order. We deem it unnecessary to discuss them in detail. We hold, with one exception, that in the context in which the conduct occurred there is substantial evidence in the record considered as a whole to warrant the inferences drawn by the Board and upon which its findings and conclusions rest.

With respect to the incident involving employee Staton we find no substantial basis for an inference that Leone's speculation over whether Staton would be able to continue his on-the-job training as a welder if the "Union gets in" constituted an employer threat to his job security or continued training. There is no evidence that Leone's observation was erroneous or represented more than a fair comment on a possible disadvantage which organization by the Union might bring. We are of the view that Leone's statement falls within the scope of an employer's rights recognized and protected under Section 8(c) of the Act.

The Board's order is affirmed except insofar as it includes the requirement that the Company cease and desist from threatening its employees with "loss of job opportunity", and the prescribed notice contains the quoted phrase.

In No. 14999 the petition of the Union is denied. In No. 14960 the petition of the Board for enforcement of its order is granted subject to deletions required by the exception above noted.

SCHNACKENBERG, Circuit Judge (dissenting in part and concurring in part).

I concur in the opinion of Judge Castle with the following exception.

Authorization cards may not establish majority representation if these cards and the circumstances surrounding their execution do not clearly manifest an intention to designate the union as the bargaining representative. NLRB v. Peterson Bros. Inc., 5 Cir., 342 F.2d 221, 224–25 (1965).

The authorization card herein (which is reproduced below) is substantially identical to, and as ambiguous (if not more so) as the one in *Peterson*.

**AUTHORIZATION TO UAW** GC 3-A

FILL IN BLANKS    DATE 7 31 62

I, the undersigned employee of

Gilcor

(Name of Company)

authorize UAW to represent me in collective bargaining.

Signature of Employee CECIL A KEARNS
Name of Employee — Please Print Cecil Kearns
Home Address 911 Rock Falls Ill
City............ State............
Class of Work Welder .... Shift 1
Telephone No MA5 5954 ..... Badge or Check No. 107

This is not an application for membership. This card is for use in support of the demand of (UAW), American Federation of Labor and Congress of Industrial Organizations (AFL-CIO) for recognition or for an NLRB election.
Form A-17—Rev. 3-56            Printed in U. S. A.

The above card first states, "I, the undersigned employee * * * authorize UAW to represent me in collective bargaining." Then, at the bottom of the

card: "This is not an application for membership. This card is for use in support of the demand of (UAW) * * * for recognition or for an NLRB election."

Both cards raise serious questions as to how understandable they are to a typical worker, unskilled in the law and legal terminology, and as to the validity of imposing strict contractual standards upon a worker in an authorization-card-situation.

It is apparent how easily such ambiguous authorization cards can be misused. In fact, the court,[1] the Board[2] and even the AFL–CIO itself,[3] have recognized that authorization cards are not the best indicators of employee choice.

Viewing the evidence in the light most favorable to the Board, it nonetheless reveals a confusion among the employees growing out of the ambiguity of the authorization cards. Four employees,[4] who each signed a card, testified that Carl Shier, a circulator of the cards and a UAW representative, said the union would petition for an election.

The probability of confusion as to the card's meaning is further evidenced by its statement that it was to be used in support of the union's demand for recognition *or* for an election. See NLRB v. Koehler's Wholesale Restaurant Supply, 7 Cir., 328 F.2d 770, 773 (1964).

In view of all of the foregoing, I would hold that the card here used is ambiguous, and that therefore substantial evidence on the record as a whole does not support the Board's finding that petitioner-employer's refusal to bargain with the union violated § 8(a) (5) and (1) of the Act, 29 U.S.C.A. § 158(a) (5) and (1).

In all other respects I would concur.

1. NLRB v. Flomatic Corporation, 2 Cir., 347 F.2d 74 (1965), where, at page 78, the court observed:
"* * * it is beyond dispute that secret election is a more accurate reflection of the employees' true desires than a check of authorization cards collected at the behest of a union organizer. See N.L.R.B. v. Hannaford Bros. Co., 261 F.2d 638, 641 (1st Cir. 1958); see also, AFL-CIO, Guidebook for Union Organizers 10, Sept. 1961."

2. Midwest Piping and Supply Co., 63 NLRB 1060 at 1070, note 13 (1945).

3. NLRB v. Flomatic Corporation, supra.

4. Robert Peska, Chester Studebaker, William Marine and Larry Ege.