**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**H. P. WASSON & COMPANY,**
**Respondent.**

**No. 17412.**

United States Court of Appeals,
Seventh Circuit.

Feb. 12, 1970.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Elliott Moore, Corinna Lothar Metcalf, Attys., National Labor Relations Board, Washington, D. C., for petitioner.

Herman J. De Koven, Richard Lee Stavins, Dorfman, De Koven & Cohen, Chicago, Ill., for respondent.

Before KNOCH, Senior Circuit Judge, and CUMMINGS and KERNER, Circuit Judges.

KNOCH, Senior Circuit Judge.

Petitioner, the National Labor Relations Board, seeks enforcement of its Order of March 13, 1968, reported at 170 NLRB No. 3, pursuant to § 10(e) of the National Labor Relations Act, as amended, Title 29 U.S.C. § 151 et seq., against respondent, H. P. Wasson & Company.

The Retail, Wholesale and Department Store Union, AFL–CIO, had been certified by the Board as the collective bargaining representative of respondent's two warehouses in Indianapolis, Indiana, after a Board-conducted election. The Union and respondent had executed a one-year collective bargaining agreement on November 19, 1965. On August 24, 1966, the Union wrote respondent requesting negotiations for a new agreement.

After receipt of the Union's letter, respondent's president, Louis Wolf, employed Walker Research, Inc., a firm engaged in such services as marketing research studies and public relations consulting for its clients, to make a survey of respondent's warehouse employees. The president of Walker, Dorothy Mae Walker, was provided a list of the employees' names and addresses. Her interviewers were to ask a single question,

the answer to which would be recorded verbatim by a court reporter. The question was:

> After the present labor contract expires on November 19, 1966, *do you* or *do you not* want the Retail, Wholesale and Department Store Union to continue to represent you as your collective bargaining agent? Putting it another way, in a very simple way, "Do you or don't you want the Union at the warehouse?"

The question was to be preceded by the following statement:

> Hello, I am Mrs. ——————— of Consumer Research Service and we have been employed by H. P. Wasson and Company to take a short opinion survey among all ware house employees. (Pause, then state-slowly-) We want to ask you a question, *but* before we do so, we want you to know that in our report to Wassons, you will not be identified by name. Instead, we will report *only* the number of "yes" answers and the number of "no" answers to our one question. We also wish to assure you that you will not be prejudiced in any way by the results of this survey or by your answer to my question.

A report only of the numerical results as "yes", "no" or "refused" with no identification of any employees, as agreed in advance, was given to respondent. The report read:

| | |
|---|---|
| yes | 7 |
| no | 27 |
| undecided | 5 |
| refused | 1 |
| not home | 7 |
| on vacation | 2 |
| couldn't locate | 2 |
| Total | 51 |

The transcripts were ordered only to enable respondent to prepare its defense and were seen only by respondent's attorney George Ryan who with Mr. Wolf and Mrs. Walker had set up the procedure for conducting the poll.

The 1965 agreement contained a maintenance of membership clause whereby employees who were or who became Union members had to maintain their membership as a condition of employment for the life of the agreement. It also provided that respondent could check-off dues of those members who executed check-off cards which were irrevocable for the life of the agreement. Forty employees submitted such cards in the fall of 1965. At the election 25 employees had voted for the Union and 17 against it. Five ballots had been challenged. Respondent's personnel director, Dexter M. Radoye and Mr. Wolf both testified that there was a large turnover in employees during the subsequent months and Mr. Wolf said few if any of the new employees submitted check-off cards, so that by August 1966, check-off cards were on file for less than a majority.

Meanwhile, as indicated in the testimony of supervisor Harry E. Webber, at intervals during the period from January to August 1966, a number of employee complaints regarding the Union came to the attention of management.

After the receipt of the results of the poll described above, respondent filed an employer's petition for an election on September 13, 1966, and the same day wrote advising the Union of that fact, explaining it had reasonable grounds for believing the Union no longer represented a majority of the employees in the unit.

The Union filed charges September 16, 1966, alleging refusal to bargain since September 13, 1966, but made no charges concerning the poll. November 8, 1966, the Regional Director of the Indianapolis, Indiana, Regional Office of the Board issued a complaint and consequently dismissed the respondent's petition for an election.

The Trial Examiner found no unfair labor practices and recommended dismissal of the complaint. The Board, however, held that respondent had violated § 8(a) (1) of the Act by conducting a coercive poll and § 8(a) (5) and 8(a) (1) by refusing to bargain with the Union.

■ We agree with respondent that the Board's finding that the poll as conducted was coercive is not supported on the record as a whole by substantial evidence. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456. The evidence is clear that the poll was taken in an atmosphere free from anti-union hostility, that it had a legitimate purpose which was communicated to the employees who were assured that no reprisals would be taken against them. Blue Flash Express, Inc., 109 NLRB 591, 593, 1954; Lilliston Implement Co., 171 NLRB No. 19, 1968; NLRB v. Chicago Perforating Co., 7 Cir., 1965, 346 F.2d 233, 236. As respondent notes, this poll antedated the secret ballot requirement of Strukesnes Construction Co., Inc., 165 NLRB No. 102, 1967, which was held not to be retroactive in *Lilliston, supra.*

The Board sees coercion in the fact that the employees were visited in their homes on a Friday evening or a Saturday without advance warning by two strangers, one of whom took verbatim notes, and concludes that an overall adverse impression created thereby could not have been dispelled by a few words of reassurance if such were in fact given. We find nothing to support a conclusion that an interview in an individual's home by neutral third person poll-takers should carry a coercive overtone.

The Board seems doubtful that the preliminary statement quoted above was in fact used. Only one employee, Mary Farley, shop steward, testified to the interview. She said she was entertaining guests on Saturday morning and was annoyed by the intrusion of the interviewer. At first she testified that the interviewer said "I represent Wassons," which would appear to be a part of the statement given to the interviewers. Mrs. Farley testified that the interviewer then said:

Mrs. Farley, I will read you two paragraphs, and you don't have to answer

if you don't want to. The issue is do you want the union to continue after this present union is over?

Mrs. Farley testified that she replied "I sure do," and "I don't care if you put it in duplicate or triplicate, that place needs a union." In response to further questions at the hearing before the Trial Examiner, she testified that:

All she said was, the one paragraph about, "Do you—"

In response to questions by the Trial Examiner, Mrs. Farley denied that the interviewer said Mrs. Farley's name would not be used or that no reprisals would result regardless of her response. She also denied that she was told the purpose of the poll, but she gathered that from the question. Mrs. Farley also testified that the conversation did not "last any time at all" and that in the confusion of her having guests and being annoyed by the interruption which to her was obnoxious, it could be that she did not hear the statement.

■ The Board's dubiety was bolstered by the fact that the court reporter present at the interview was not promptly called as a witness if in fact the statement was read to Mrs. Farley. However, the testimony clearly showed the procedures planned and Mrs. Walker's testimony respecting the conduct of the survey had already been heard prior to Mrs. Farley's testimony. It was the General Counsel's burden to come forward with rebuttal testimony to the evidence already given which had shown the poll to be carefully designed to avoid any coercive effect. NLRB v. D. Gottlieb & Company, 7 Cir., 1953, 208 F.2d 682. The General Counsel had asked for and received 15 days to prepare rebuttal. The Trial Examiner found:

■

Although 40 employees were interviewed and the General Counsel was given 15 days in which to obtain the testimony of the employees respecting the manner of polling only one witness was called. She stated, above, that she could not *remember* that the preliminary statement was read to her but also admitted she was both confused and angry at the time and that the statement could have been read and she did not hear it.

The Trial Examiner was better equipped than the Board to weigh the testimony of Mrs. Walker, and the Board presented no substantial basis for disregarding his assessment. See Universal Camera Corp. v. NLRB, *supra*, 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456.

The Board speaks of the presumption that a certified union retains the support of a majority of the employees in the unit absent a showing of objective facts for a reasonable belief otherwise. Assuming, without deciding, that the random employee complaints, absent any decertification petition, would not in themselves support a belief that the Union had lost its majority status, we agree that the large turnover and the decrease in check-off cards could reasonably give rise to genuine doubts.

We need not decide whether the poll, as respondent contends, would have been non-coercive in the absence of the introductory statement because we find no support in the record for a conclusion that it was not given.

■ In the light of our decision respecting the poll, the Board's findings of refusal to bargain also fail of support. Enforcement of the Board's Order will be denied.

Enforcement denied.