TEAMSTERS LOCAL UNION 769, Affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, Helpers of America, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent, Peoples Gas System, Inc., Intervenor.

No. 75-1250.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 13, 1976.

Decided April 8, 1976.

Rehearing Denied May 13, 1976.

---

Seymour A. Gopman, North Miami Beach, Fla., for petitioner. William T. Coleman, Jr., Miami, Fla., was on the brief for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., with whom John C. Miller, Acting Gen. Counsel and John S. Irving, Jr., Deputy Gen. Counsel, N. L. R. B., Washington, D. C., were on the brief for respondent.

Jesse S. Hogg, Coral Gables, Fla., with whom W. Reynolds Allen, Coral Gables, Fla., was on the brief for intervenor.

Before BAZELON, Chief Judge, TAMM, Circuit Judge and JUSTICE,* United States District Judge for the Eastern District of Texas.

Opinion for the court by Chief Judge BAZELON.

Circuit Judge TAMM dissents from the opinion.

BAZELON, Chief Judge:

In September, 1966 Teamsters Local Union 769, the petitioner, was certified by the NLRB as the exclusive bargaining representative of the production, maintenance and distribution employees of Peoples Gas System Inc.'s Miami operations. The Union and employer signed a three-year contract in 1967 and, after a strike in February, 1970, signed a second three-year contract that expired on February 6, 1973. Negotiations on a third contract began on January 9, 1973. After six bargaining sessions and several communications by phone and letter, the Company, on April 23, 1973, filed a representation election petition with the Board and thereafter refused to bargain further with the Union.

On May 15, 1973, the Union filed an unfair labor practice charge with the Board, alleging that the employer's refusal to bargain violated § 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5). The General Counsel issued a complaint, and after conducting hearings, the Administrative Law Judge found the Company guilty of an unfair labor practice. His decision was reversed by a three-member panel of the Board. After the Union's petition for reconsideration was denied, the Union filed this appeal.

I

A threshold question has been raised by the Intervenor-Employer in a motion to dismiss the appeal as moot. In support of this motion Intervenor notes that the record, as supplemented by order of this court in response to an earlier motion by Intervenor, reveals that on the day after its motion for reconsideration was denied, the Union filed a petition for certification of representative with the Board. An election was held on May 30, 1975, which the Union lost by roughly a 3–2 margin. No objections to the election were filed, and on June 10, 1975, the results were certified. Intervenor contends that even if its refusal to bargain were unlawful, the likelihood of repetition is now almost nil, since there currently is no bargaining representative for the unit. Intervenor therefore urges this court to exercise its discretion [1] to decline to adjudicate this case.

Implicit in Intervenor's argument is the assumption that even if the Union were to prevail on the merits, the only appropri-

---

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

1. *NLRB v. Typographical Local 101,* 152 U.S. App.D.C. 365, 470 F.2d 1274 (1972).

ate remedy after the Union's election defeat would be a cease and desist order aimed against future refusals to bargain. If all that were at issue were the possible issuance of a cease and desist order, Intervenor's argument might be persuasive.[2] But we agree with the position taken by counsel for the Board that the Board's remedial powers are not so limited.[3] At least at this stage of the proceedings, we are not prepared to say that were the Board's decision to be reversed, the Board would be powerless to mandate a new election or even to issue a bargaining order. To be sure, the Board's practice has been not to issue a bargaining order on the basis of pre-election refusals to bargain if a union thereafter loses an election and the results are certified.[4] Nor has the Board entertained challenges to elections based on conduct occurring before the election petitions were filed.[5] But these rules were developed to prevent parties from bypassing the Board, seeking an election, and then, if unsuccessful in a fair election, seeking relief from the Board. Intervenor concedes that this appears to be the first case in which an election was requested and held only after all Board remedies had been exhausted and solely as a means of "bypassing" the courts—that is, of avoiding the delay attendant upon appellate review. We do not believe the Board would lack the power—and will not speculate as to whether it would have the will—to create an exception to its rules in this case. Accordingly, we reach the merits of the petition for review.

## II

■ The Board's decision begins with a statement of the well-established principle applicable to withdrawals of recognition from incumbent unions:[6]

> After the certification year has run, an employer may lawfully withdraw recognition from an incumbent union because of an asserted doubt of the union's continued majority, if its withdrawal occurs in a context free of unfair labor practices and is supported by a showing of objective considerations providing reasonable grounds for a belief that a majority of the employees no longer desire union representation.

This formulation is in general conformity with our requirement[7] that serious doubt of the Union's majority be shown,[8] and essen-

---

**2.** *See NLRB v. Raytheon Co.*, 398 U.S. 25, 27, 90 S.Ct. 1547, 1548, 26 L.Ed.2d 21, 24 (1970).

**3.** *See, e. g., Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 405, 13 L.Ed.2d 233, 241 (1964); 29 U.S.C. § 160(c) (1970).

**4.** *Irving Air Chute*, 149 NLRB 627 (1964), *enforced*, 350 F.2d 176 (2d Cir.1965); *see Retail Clerks Local 1401 v. NLRB*, 149 U.S.App.D.C. 370, 463 F.2d 316 (1972). *See also Bernel Foam Products*, 146 NLRB 1277 (1964).

**5.** *Goodyear Tire & Rubber Co.*, 138 NLRB 453 (1962); *Ideal Electric & Manufacturing Co.*, 134 NLRB 1275 (1961).

**6.** *Peoples Gas System, Inc.*, 214 NLRB No. 141 at 2 (1974).

**7.** *See, e. g., Industrial Wrkrs. Local 289 v. NLRB*, 155 U.S.App.D.C. 112, 476 F.2d 868, 881 (1973) and *Machinists Lodges 1746 and 743 v. NLRB*, 135 U.S.App.D.C. 53, 416 F.2d 809, 812 (1969), *cert. denied*, 396 U.S. 1058, 90 S.Ct. 751, 24 L.Ed.2d 752 (1970), *quoting Stoner Rubber Co.*, 123 NLRB 1440, 1445 (1959).

**8.** *See Bartenders, Hotel, Motel & Restaurant Employers Bargaining Ass'n*, 213 NLRB No. 74 at 9 (1974) (equating "reasonable doubt" and "serious doubt"). *Compare* cases cited note 7 *supra with Dallas Drivers Local 745 v. NLRB*, 163 U.S.App.D.C. 100, 500 F.2d 768, 770 (1974), and *Retail Union v. NLRB*, 151 U.S.App.D.C. 209, 466 F.2d 380, 393 (1972) (both employing a "reasonable doubt" test).

This court, along with other circuits, *see, e. g., NLRB v. Washington Manor Inc.*, 519 F.2d 750, 751 (6th Cir.1975); *Retired Persons Pharmacy v. NLRB*, 519 F.2d 486, 489 (2d Cir.1975); *Orion Corp. v. NLRB*, 515 F.2d 81 (7th Cir. 1975), and the Board, *see, e. g., Guerdon Industries*, 218 NLRB No. 69 (1975); *Celanese Corp.*, 95 NLRB 664 (1951), has repeatedly held that to be a defense, a "reasonable" or "serious" doubt requires both objective facts to support it and good faith in asserting it. Here, however, the Board did not discuss the employer's motivation in withdrawing recognition from the Union. Petitioner does not contend, however, that the Board deviated from its prior decisions in this regard.

tially is not contested on this appeal. What is at issue here is whether there was a sufficient objective basis to give rise to such a doubt.

■ The Board relied on a combination of three factors to find an objective basis for a reasonable doubt. First, it noted that from February, 1970, immediately before a strike, to April, 1973, there was a "severe and dramatic" decline in the number of dues-checkoff authorization cards on file with the Company.[9] In 1970, 76% of all members of the unit, and 90% of all non-probationary members—persons who had been employed for over 90 days and under company policy were eligible for checkoff—had submitted authorizations; in 1973 the comparable figures were 39% and 51%.[10]

Second, the Board discussed what it termed "a sudden and unexplained change in bargaining posture under circumstances strongly suggestive of a lack of confidence by the Union itself as to the degree of support it had maintained." Specifically the Board noted that the Union, after having insisted throughout the 1973 negotiations that it would strike if no agreement had been reached when the old contract expired, announced on February 2, four days before the expiration date, that the bargaining committee would submit the employer's final but incomplete offer to the membership, but would recommend rejection; that on February 5th the bargaining committee reversed itself and recommended acceptance of the offer; and that after a series of communications, concerning what agreement, if any, had been reached, the Union, on April 11, 1973 and again several times after the Company withdrew recogni-

tion, announced its willingness to sign whatever agreement the Company drafted, subject to the Union's right to proceed through the Board to vindicate its claim that agreement already had been reached on certain issues.

Third, the Board noted substantial changes in the composition of the unit since 1970. During the strike, 40% of the work force had been permanently replaced. In September, 1972, the size of the unit increased 17% by the addition of previously non-unionized employees acquired in a merger with a competitor; none of those employees had submitted checkoff authorization cards as of April, 1973 despite an organizational effort beginning in January, 1973. And from September, 1972 to April, 1973, the unit experienced a 36% turnover.[11]

Relying on "the totality of these circumstances," the Board found that the employer had an objective basis for doubting the Union's continuing majority.

### III

Petitioner contends that the employer could not reasonably have doubted the Union's majority when a majority of the eligible employees had submitted checkoff authorizations. Insofar as petitioner argues for a *per se* prohibition on employers ever withdrawing recognition from an incumbent union under these circumstances, we cannot agree. Just as an employee's decision not to submit an authorization card does not necessarily mean he opposes the union,[12] so, too, a decision to submit a card—or not to withdraw an already submitted card—does not necessarily mean the employee supports the union. Decisions to

---

9. During all times relevant to this case, Florida was a right to work state.

10. Intervenor contends that the ALJ and the Board erred in including two employees as being on checkoff, and that without these employees the relevant percentage would be under 50%. We cannot say, however, that the Board's factual finding is without substantial support in the record.

11. The Board also stated that from 1970 to 1973 the turnover rate was 36%. That state-

ment does not appear to be supported by anything in the record.

12. *See, e. g., Terrell Machine Co. v. NLRB*, 427 F.2d 1088 (4th Cir.), *cert. denied*, 398 U.S. 929, 90 S.Ct. 1821, 26 L.Ed.2d 91 (1970); *NLRB v. Gulfmont Hotel Co.*, 362 F.2d 588 (5th Cir. 1966); *Harpeth Steel Inc.*, 208 NLRB 545 (1974); *Barrington Plaza & Tragniew, Inc.*, 188 NLRB 962 (1970), *enforcement denied in part*, 470 F.2d 669 (9th Cir.1972).

submit or not withdraw authorizations may be attributable to confusion, ignorance, peer pressure, and, in cases of failure to withdraw, to procrastination or inertia.[13] For these reasons, the Board has more than once upheld an employer's refusal to bargain with an incumbent union even though a majority of the employees had submitted checkoff authorizations.[14] In an appropriate case, we would agree.

██ But insofar as petitioner is contending that the employer bears a heavy burden in this case, petitioner is clearly correct. The Union can claim the benefit of two well-established presumptions (in addition to the general presumption that an incumbent union has a continuing majority): (1) that all the employees on checkoff—51% of the nonprobationary employees—supported the Union as their bargaining representative; [15] and (2) that the same proportion of new or probationary employees—51%—also supported the Union.[16] In light of these presumptions, the employer could reasonably doubt the Union's continuing majority if, but only if, there were an objective basis for believing either that (a) the checkoff cards overstated the Union's support among the nonprobationary employees, or (b) a lesser percentage of the probationary employees supported the Union such that the Union lacked a majority of the total unit. In finding an objectively based reasonable doubt, however, the

Board's opinion fails to focus on these narrow issues; indeed, the opinion does not appear to attach any significance to the fact that a majority of the eligible employees were on checkoff. Consequently, we are left at large to speculate as to the relevance of the factors on which the Board did rely.

Our difficulty becomes clear when those factors are separately analyzed. The Board first considered the decline in the employees on checkoff. The courts and the Board have recognized the relevance of this consideration when less than a majority of the employees were on checkoff.[17] In those cases the trend of checkoffs strengthened the inference that the low number of checkoff cards reflected a lack of union support.[18] Here, however, the significance of the trend is unclear. Does the decline indicate that persons still on checkoff actually may not support the Union? Does it indicate that persons not yet eligible for checkoff do not support the Union? We do not mean to suggest that the Board could not answer either or both of these questions in the affirmative. The point is that the Board has not provided us with a reasoned basis for doing so.

Much the same is true when the Board's second factor, changes in composition of the unit, is considered. Again, this factor has been considered relevant in other cases, generally when used to impeach the contin-

---

**13.** This is especially true where, as here, the authorization cards, by their terms, are revocable for only a ten day period each year.

**14.** *Mitchell Standard Corp.,* 140 NLRB 496 (1963); *Randall Co.,* 133 NLRB 289 (1961).

**15.** *See, e.g., Machinists Lodges 1746 & 743, supra* note 7, at 812 n.8; *NLRB v. Howe Scale Co.,* 311 F.2d 502, 505 (7th Cir.1963); *NLRB v. Auto Ventshade, Inc.,* 276 F.2d 303, 307 (5th Cir.1960); *United Supermarkets, Inc.,* 214 NLRB No. 142 at 3 (1974); *Mitchell Standard Corp., supra* note 14, at 500.

**16.** *See, e.g., Strange & Lindsey Beverages, Inc.,* 219 NLRB No. 190 (1975); *Laystrom Manufacturing Co.,* 151 NLRB 1482 (1965), *enforcement denied,* 359 F.2d 799 (7th Cir.1966). *See also, e.g., NLRB v. King Radio Corp.,* 510 F.2d 1154, 1156 (10th Cir.), *cert. denied,* 423 U.S. 839, 96

S.Ct. 68, 46 L.Ed.2d 58 (1975); *Dallas Drivers Local 745 v. NLRB, supra* note 8, at 771.

**17.** *National Cash Register Co. v. NLRB,* 494 F.2d 189, 194–95 (8th Cir.1974); *Ingress-Plastene, Inc. v. NLRB,* 430 F.2d 542, 546–47 (7th Cir.1970); *NLRB v. H. P. Wasson & Co.,* 422 F.2d 558, 561 (7th Cir.1970); *Convair Division,* 169 NLRB 131 (1965). *See also Machinists Lodges 1746 & 743 v. NLRB, supra* note 7, at 812 (relying on decline in checkoff cards but not specifying percentage on checkoff).

**18.** Although unstated, the justification appears to be that since the reasons why union supporters would not submit authorization cards remain constant over time, a sharp decrease in the number of cards suggests a decrease in union support (and not an increase in the number of supporters not on checkoff).

uing vitality of an earlier showing of support such as an election.[19] But here the issue is not the significance of some *past* showing of support, but of a *present* showing. Thus, the relevance of turnover prior to the present showing of support is attenuated.

The changes in composition on which the Board relied can be divided into two types. First is the 40% turnover occurring after the 1970 strike, and the 17% accretion resulting from the 1972 merger—changes "under circumstances suggesting a lesser degree" of Union support.[20] But all the persons added as a result of these two events already were, if they were still employed by the Company, nonprobationary employees at the time recognition was withdrawn. Thus, they already were counted as part of the 51% on checkoff or the 49% off.[21] Perhaps the Board intended to conclude that the circumstances under which these employees were added suggests that even those who submitted authorization cards might not have been Union supporters, so that the 51% figure is misleading. Or perhaps the Board thought these circumstances were relevant to the issue of Union support among new employees. But again the Board failed to articulate its reasons for so concluding.

The second aspect of the change in composition was the 36% turnover from September, 1972 to April, 1973—turnover under "neutral" circumstances. The relevance of this turnover is even less clear. Precise-

ly because the circumstances surrounding the turnover were neutral, the high rate—projected to 61% annually—does not appear relevant to establishing doubt as to whether the probationary employees desired to be represented by the Union.[22]

The final factor considered by the Board—the Union's "strange" behavior during negotiations—is directly relevant to impeaching the significance of the number of employees on checkoff. But the Board's opinion does not indicate whether it regarded the bargaining events as alone sufficient to support its decisions, yet, as already noted, the Board failed to explain the relevance of the other factors. Accordingly, we return the case to the Board for reconsideration and rearticulation of its decision.[23]

IV

We briefly consider several additional claims of error raised by petitioner, in the hope of shortcircuiting any future litigation after the proceedings on remand. In so doing, we do not decide whether these grounds, either separately or together, would provide an independent basis for reversing the Board.

1. Much of the evidence concerning changes in composition of the unit and the decline in checkoff authorizations was not based on the first-hand knowledge of the witness who supplied it, the counsel to the Company, but on what he was told by personnel in the Company's payroll depart-

---

19. *See e.g., Taft Broadcasting,* 201 NLRB 801 (1973); *Lloyd McKee Motors Inc.,* 170 NLRB 1278 (1968); *Stoner Rubber Co.,* 123 NLRB 1440 (1959). *But see, e.g.,* cases cited note 16 *supra.*

20. Petitioner has not questioned whether the Board's assumption that replacements for strikers are less likely to support a union than strikers can be reconciled with decisions such as *Industrial Wrkrs. Local 289 v. NLRB, supra* note 7, at 881, *James Whitfield Inc.,* 220 NLRB No. 64 (1975), or *King Radio Corp.,* 208 NLRB 578 (1974), *enforced,* 510 F.2d 1154 (10th Cir. 1975), all holding that strikebreakers are *not* presumptively anti-union.

21. In its brief, the Board fails to recognize this fact, and thus uses turnover in 1970 and in

September of 1972 to support an inference that the new employees—those hired after January, 1973—did not support the Union in the same ratio as the nonprobationary employees. Brief at 15 & n. 12.

22. It would seem that, if anything, the new employees should more strongly support the Union than the old employees, since the new employees were not hired under circumstances suggesting a lesser degree of Union support.

23. *See, e.g., SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *Sheet Metal Local 223 v. NLRB,* 162 U.S.App.D.C. 145, 498 F.2d 687 (1974); *UAW v. NLRB,* 136 U.S.App. D.C. 104, 419 F.2d 686 (1969).

ment.[24] Although petitioner did not object to every hearsay statement, and stipulated to much of the evidence concerning the trend in checkoffs,[25] the hearsay objection was repeatedly advanced.[26] The Administrative Law Judge's ruling is not entirely clear,[27] but it appears that he admitted the testimony solely to establish the Company's motivation for withdrawing recognition, and not to prove an objective basis for action.[28] The ALJ's opinion clearly assigns little weight to the hearsay testimony.[29] The Board, however, treated the testimony as fully probative evidence. Petitioner argues that the Board erred in so doing.

■ That the Board has some discretion to admit evidence that would be inadmissible in a court of law cannot be denied.[30] Nor can its power to overrule an ALJ's ruling on evidentiary issues be questioned.[31] But the Board at least should

24. It is unclear whether counsel's testimony regarding turnover after the 1970 strike was based on first hand knowledge. *See* Tr. at 170. The remainder of his statistical testimony admittedly was hearsay.

25. *See* Tr. at 167 (stipulated that 90% of nonprobationary employees on checkoff in 1970); Jt. Exhibit 1 (listing of all nonprobationary employees as of April 23, 1973 with indication of which were on checkoff).

26. *See* Tr. at 170, 195–96, 197–98.

27. *Compare* Tr. at 195, 196 (testimony admissible only to prove good faith) *with id.* at 198 (if documents were given to General Counsel, "you can't contradict it unless it's not a fact, and if you think it's significant, present the testimony").

28. Tr. at 195, 196; *cf. Schwarzenbach-Huber Co. v. NLRB,* 408 F.2d 236 (2d Cir.), *cert. denied,* 396 U.S. 960, 90 S.Ct. 436, 24 L.Ed.2d 425 (1969).

29. *Peoples Gas System, Inc., supra* note 6, at 17 ("*asserted* replacement of 40 percent of the strikers"), 21 ("no probative evidence . . . to substantiate these figures" concerning checkoff cards), 24 ("unsubstantiated" evidence regarding turnover "a weak reed . . . to sustain a reasonable doubt").

30. 29 U.S.C. § 160(b) (1970) states that "so far as practicable," Board hearings "[shall] be conducted in accordance with the rules of evidence . . . ." The courts have read this section liberally. *See, e.g., NLRB v. Addison Shoe Corp.,* 450 F.2d 115 (8th Cir.1971); *NLRB v.*

address the evidentiary questions, and articulate its reasons for reversing the ALJ.[32] In this case the Board failed to do so.

■ 2. Petitioner points to a number of areas in which it alleges the Board decision is inconsistent with prior or subsequent Board decisions. The Board cannot be expected, on pain of reversal, to anticipate and distinguish every marginally relevant case that a litigant might uncover in preparing a petition for review. But the Rule of Law requires that agencies apply the same basic standard of conduct to all parties appearing before them. Thus, "if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute." [33]

■ Some of the cases to which petitioner points are so palpably distinguishable that there was no need for the Board to address them.[34] But in at least two re-

*Capitol Fish Co.,* 294 F.2d 868 (5th Cir.1961); *NLRB v. W. B. Jones Lumber Co.,* 245 F.2d 388 (9th Cir.1957); *NLRB v. Hod Carriers Local 210,* 228 F.2d 589 (2d Cir.1955).

31. *Cf. Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Local 4–243, Oil Wrkrs. v. NLRB,* 124 U.S.App. D.C. 113, 362 F.2d 943 (1966).

32. *See, e.g., Local 4–243, supra* note 31, at 946; *F. W. Means & Co. v. NLRB,* 377 F.2d 683 (7th Cir.1967). *See also* cases cited note 23 *supra.*

33. *Greater Boston TV Corp. v. FCC,* 143 U.S. App.D.C. 383, 444 F.2d 841, 852 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971); *see, e.g., Teamsters Local 814 v. NLRB,* 167 U.S.App.D.C. 387, 512 F.2d 564, 567 (1975); *id.,* at 571–72 & cases cited n.15 (Bazelon, C. J., dissenting in part).

34. For example, petitioner complains that in considering its "strange" bargaining behavior, the Board ignored Kentucky News, 165 NLRB 777 (1967), holding that the failure to implement a strike threat was "no basis for the conclusion . . . [of] lack of employee support." But there the Union's decision not to strike was an isolated event whereas here the Board considered the decision in the context of a series of events culminating in what the Board regarded as "capitulation" by the Union. Similarly, petitioner contends that *Barrington Plaza & Tragniew, supra* note 12, precluded the Board from considering the turnover after the 1970 strike because it was too remote in time.

spects, petitioner's argument has some merit. First, in drawing an inference from the decision of the employees added by merger not to submit checkoff cards, the Board appears to have ignored its decisions holding that such a decision does not mean the employees oppose representation by the Union.[35] Second, the Board recited events that occurred after the employer withdrew recognition from the Union, suggesting that it was relying on such events in contravention of several Board decisions.[36] We do not mean to imply that the Board necessarily was precluded from relying on these facts. It was, however, required to justify its decision to do so.[37]

*Reversed.*

**Lee A. TURZILLO et al.**

v.

**P & Z MERGENTIME, Appellant.**

**Lee A. TURZILLO et al., Appellants,**

v.

**P & Z MERGENTIME.**

Nos. 75–1079, 75–1080.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 19, 1976.

Decided April 8, 1976.

On Rehearing June 2, 1976.

But *Tragniew,* by its terms, is limited to cases in which an employer defends against an 8(a)(5) charge by contending that at the time of a prior contract the union lacked majority support.

**35.** *See* cases cited note 12 *supra.*

**36.** *See, e.g., Bartenders, Hotel, Motel & Restaurant Employers Bargaining Ass'n, supra* note 8; *Orion Corp.,* 210 NLRB 633 (1974), *enforced,* 515 F.2d 81 (7th Cir.1975).

**37.** We do not consider intervenor-employer's contentions that the ALJ improperly excluded some of its evidence establishing an objective basis for the employer's doubt. On remand the Board can reopen the hearings to consider this evidence if it finds the evidence already in the record insufficient to support the employer's claim, and further finds that the ALJ erred in excluding the additional evidence.

Charles E. Townsend, Jr., San Francisco, Cal., of the bar of the Supreme Court of California pro hac vice by special leave of Court, with whom Edward F. McKie, Jr., Washington, D. C., was on the brief for appellant in No. 75–1079 and appellee in No. 75–1080.

Donald L. Otto, Cleveland, Ohio, with whom Donald D. Jeffery, Washington, D. C., was on the brief for appellees in No. 75–1079 and appellants in No. 75–1080.

Before McGOWAN and LEVENTHAL, Circuit Judges, and ALBERT V. BRYAN, Jr.,* United States District Judge for the Eastern District of Virginia.

Opinion for the Court filed by Circuit Judge LEVENTHAL.

---

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

LEVENTHAL, Circuit Judge:

This is an appeal from an interlocutory judgment of the District Court holding two patents issued to plaintiff-appellee Lee A. Turzillo valid, and finding infringement by defendant-appellant P & Z Mergentime [1] with respect to the later issued patent. One is United States Patent No. 3,363,422 ('422 Patent), issued January 16, 1968, for a method and apparatus for anchoring a tie-down bar in an earth situs. The other is United States Patent No. 3,464,216 (the '216 Patent), issued September 2, 1969, for a method and means for forming cast-in-place reinforced concrete piles. On April 24, 1972, Lee A. Turzillo and Lee Turzillo Contracting Co., the licensee of the patents, filed a complaint charging P & Z Mergentime with infringement of claim 1 of the '422 patent and claims 1–6 of the '216 patent arising from the defendant's installation of tie backs at WMATA's operations center at 5th and G Streets, N.W., the National Gallery of Art (NGA), and the Union Station branch of the new District of Columbia subway system. Plaintiffs alleged that the '422 patent was infringed by defendant's continuous auger method, used principally at the operations center and NGA, and that the '216 patent was infringed by defendant's use of the sectional auger method, employed at Union Station.

On October 29, 1974, the trial court, sitting without a jury, issued a Memorandum Opinion, followed by a Judgment, filed November 25, 1974, declaring '422 valid as to claim 1 and '216 valid as to claims 1–6; and ruling that defendant had not infringed '422 but had infringed claims of 1–6 of '216 through its sectional auger method. The trial court enjoined further infringement, and referred the case to an auditor to determine damages.

## I. '422 PATENT

The District Court opinion is largely devoted to a discussion of the prior art and the validity of the '422 patent. We have doubts about the ruling that the '422 patent is valid but we simply vacate that ruling rather than resolve the issue of validity in this litigation since, in any event, we are satisfied that the findings by the judge concerning noninfringement were not clearly erroneous.

### A. The Patent

We begin by repeating, almost verbatim, the District Court's description of the patent—compiled with an acknowledgement that we doubt we could have understood it without the aid of the diagrams in the patents and briefs of counsel.

The '422 patent relates to a method and apparatus for anchoring a tie-down bar in an earth situs using a hollow-shafted auger or drill. The central passage of the drill is closed at its inner end by a driving bit, which is a unit separate from the drill. The driving bit consists of a cutting member, sometimes a flat, pointed piece of steel which assists in forming the hole; a base plate or closure plate which covers the lower end of the drill; and a cylinder portion which is attached to the back side of the plate. The cylinder portion may be square or round and may or may not be threaded. Its function is to accept a steel tendon or reinforcing bar. The bar, whose length will be the entire length of the hole to be formed, is welded or threaded to the base plate at its center and is inserted into the central passageway of the auger before drilling. After the bit with its reinforcing bar is loaded onto the drill, the bit is releasably connected to the shaft of the drill so that there is no relative motion between the drill shaft and the bit. The bit and the drill thus act as a unit in forming the hole. In the preferred form of plaintiff's invention, the driving bit is releasably retained at the inner end by a pin which is inserted through the reinforcing bar at the top of the drill and which spans the outer diameter of the drill so that it acts, simultaneously, as a

---

1. A joint venture company composed of P & Z Company, Inc., a California corporation, and Mergentime Corporation, a Delaware corporation.

drive to rotate the bit and a means to lock the driving bit to the inner end of the drill. In the field, however, Turzillo used other, equivalent means, such as wood shims, cloth, or a ball-spring detent device at the lower end of the drill to wedge the driving bit into the inner diameter of the shaft. Also commonly used by plaintiff to accomplish an equivalent releasable connection was ordinary bailing wire wrapped about the tip of the driving bit and an outer portion of the drill shaft. After drilling, the bit and tie-down bar are released from the drill. The bit then acts as an anchor for the bar while the drill is progressively removed from the hole and fluid cement is fed through the central passageway of the drill to form a concrete column.

The result of this method is a column of concrete surrounding a steel tendon which has been accurately centered within the column. Such tie backs are not the equivalent of the familiar concrete columns into which reinforcing bars have been inserted. By using steel of varying tensile strengths and by accurately centering the tendons, tie backs or tie-downs may be constructed which are used, among other uses, to hold back earth walls in excavation sites thus relieving the site of a great deal of clutter and allowing actual construction to proceed much faster, to hold buildings firmly down, or to keep buildings from sinking.

### B. *District Court's Rulings as to Prior Art*

The District Court examined the leading examples of prior art cited by defendant.[2] It noted that with the exception of Phares, the patent examiner had all this art before him, and concluded that it saw no reason to overturn his decision to issue a patent on claim 1 of '422.

The District Court's judgments as to these matters is fairly indicated by its discussion of the prior Patterson patent and Turzillo's improvement thereon, as follows:

Patent No. 2,729,067 to Patterson in 1956 showed the use of a drill to define a cavity in the earth and, in one embodiment, the use of a hollow shafted auger through which cement grout is passed is proposed. In this embodiment, grout pressure is used to drive the driving bit from the auger shaft.

Thus, as early as 1956, those in the trade had all the elements available to them to form tension piles in the manner of Turzillo '422. Yet, for one reason or another tension piles could not be formed efficiently using these known methods. The testimony of Mr. Turzillo and Mr. Liver, an officer of the Turzillo Company, showed that in the mid-sixties Intrusion Prepakt was still using the Patterson method of first forming the pile and then manually inserting the steel tendon into the formed pile. However, this method could not produce the desired results and in at least one tie back job done for the Gulf Power Company in Louisiana Intrusion Prepakt was replaced by Turzillo's company. Intrusion Prepakt now holds licenses under both the '422 and the '216 patents. Indeed, defendant's first attempt to construct tie backs under their [sic] contracts in Washington was to use the even older percussion method of driving pipes into the ground and manually inserting the reinforcing bar after drilling. This method, however, resulted in too many failures. Defendants then switched to the methods now accused of

2.   (1) U.S. Patent No. 1,805,265 to Taussig for a screw conveyor pile, published May 12, 1931, assigned to Raymond Concrete Pile Company of New York;

(2) U.S. Patent No. 2,146,645 to Newman for foundation construction, published February 7, 1939;

(3) U.S. Patent No. 2,729,067 to Patterson for a method for forming piles, published January 3, 1956, assigned to Intrusion Prepakt, Inc.;

(4) German printed application No. 1,104,-905 to Bauer for a traction anchor for anchoring structures in the ground, published April 13, 1961;

(5) U.S. Patent No. 3,200,599 to Phares for apparatus for forming piles, published August 17, 1965, assigned to Raymond International, Inc.;

(6) U.S. Patent No. 3,228,200 to Dufresne for a method of forming concrete piles, published January 11, 1966.

infringement and thereafter had no test failures after the pile was formed.

(J.A. 11–12).

As to such findings we see no reason for appellate intervention. A different question arises, however, in connection with the Phares patent. It was not called to the attention of the patent examiner. It was published August 17, 1965, after the filing of Turzillo's application on March 19, 1965, but well before the issuance of the '422 patent on January 16, 1968. The District Court rejected defendant's contention that the '422 patent should be held invalid because of the applicant's failure to cite Phares to the patent office during prosecution of the application. It stated:

> Defendant cites *Beckman Instruments, Inc. v. Chemtronics, Inc.,* 428 F.2d 555 (5th Cir. 1970); *Monsanto Co. v. Rohn & Haas, Inc.,* 456 F.2d 592 (3d Cir. 1972); *Carter-Wallace v. Davis-Edwards Corp.,* 443 F.2d 867 (2d Cir. 1971); and *Norton v. Curtiss,* 433 F.2d 779, 57 CCPA 1384 (1970), in support of its position. None of these cases stand for the proposition that the mere failure to cite a reference, without more, is grounds for invalidating a patent. To be sure an applicant has a high duty to inform the Patent Office of all pertinent facts affecting the prosecution of his application. But the examiner in his initial search, searched the subclass in which Phares was classified and cited the Dufresne and Newman references from that subclass as prior art.[2] At this point, as is discussed below, the examiner had all of the most pertinent art before him. Assuming Turzillo actually knew of the Phares at this time, he could as well been of the opinion that Phares was not pertinent to his invention. Defendant has made no showing, and has not attempted to show, the wilful nature of plaintiffs' failure or a recognition or admission on the plaintiffs' part that Phares should have been brought to the examiner's attention. Moreover, Phares is not a 102 reference,[3] as was the case in *Beckman,* and does not completely negate the '422 claims. On the basis of the record before the court, the court rejects defendant's contention. However, to the extent that the presumption of validity is affected by the possibility that the examiner did not have Phares before him, the court will more closely examine '422 against the prior art including Phares.

> [3] 35 U.S.C. 102.

(J.A. 9–10).

As appears from the foregoing, the District Court indicated that it would closely examine '422 in view of the failure to disclose the Phares patent. However, when it came to examining the significance of Phares, its analysis consisted of the following:

> Finally, the Phares device, as disclosed in Figures 22–24 of the specification is an attempt to combine all the known elements to form a tension pile with steel tendons centrally located within the pile. However, the Phares device is significantly more complex than that of Turzillo, as a comparison of the disclosure of Turzillo with that of Phares, Figures 22–24 and accompanying text, will illustrate.

> The examiner had before him all the art cited above with the exception of Phares and in the face of these references issued claim one of '422. The court sees no reason to overturn his decision. The installation of tension pile or tie backs is a relatively new field. If a new combination and arrangement of known elements produces a new and beneficial result, never attained before, it is evidence of invention. *Maschinenfabrik Rieter A.G. v. Greenwood Mills,* 340 F.Supp. 1103 (D.S. C.1971). None of the cited references completely anticipates plaintiffs' claimed invention. In determining obviousness under 35 U.S.C. § 103 hindsight reconstruction of the prior art after the invention's commercial acceptance is not the applicable standard. *Id.; Simplicity Mfg.*