NEW YORK PRINTING PRESSMEN AND OFFSET WORKERS UNION, NO. 51, INTERNATIONAL PRINTING AND GRAPHIC COMMUNICATIONS UNION, AFL–CIO, and Local No. 23, New York Printing Assistants and Offset Workers, International Printing and Graphic Communications Union, AFL–CIO, and Local 1, International Printing and Graphic Communications Union, AFL–CIO, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Arkay Packaging Corporation, Intervenor.

No. 733, Docket 77–4194.

United States Court of Appeals, Second Circuit.

Argued March 16, 1978.

Decided May 3, 1978.

Thomas J. Lilly, Garden City, N. Y. (Doran, Colleran, O'Hara, Pollio & Dunne, P. C., Garden City, N. Y., of counsel), for petitioners.

Arnold B. Podgorsky, Atty., N. L. R. B., Washington, D. C. (John S. Irving, Gen. Counsel, John D. Burgoyne, Asst. Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C.), for respondent.

Hugh P. Husband, Jr., Arkay Packaging Corp., New York City, for intervenor.

Before MULLIGAN and GEWIN,* Circuit Judges, and MILLER, Judge.**

MILLER, Judge:

This case is before the court for review of the decision of the National Labor Relations Board ("Board")[1] dismissing the General Counsel's consolidated complaint, based on charges by petitioning Locals 51, 23, and 1 ("Unions"), against Arkay Packaging Corporation ("employer" or "Company"), alleging that the Company had engaged in unfair labor practices. The Board panel split 2–1 for dismissal of the complaint after the Administrative Law Judge ("ALJ") had found that the Company engaged in certain unfair labor practices within the meaning of sections 8(a)(5) and (1) of the National Labor Relations Act, as amended ("Act"), 29 U.S.C. §§ 158(a)(5) and (1).[2]

### FACTS

The Company's employees were represented for several years in separate bargaining units by seven unions, including the three involved in this appeal. Until 1974 the Company belonged to an employer association which negotiated collective bargaining agreements with all seven unions on

behalf of the Company. In that year, the Company withdrew from the association and negotiated directly and separately with the petitioning Unions, entering into one-year collective bargaining agreements containing a 30-day union security clause. The Local 51 agreement was to expire March 3, 1975; the other two agreements were to expire April 30, 1975. The Company also negotiated directly, but unsuccessfully, with Local 119B, Graphic Arts International Union, AFL–CIO, which commenced an economic strike against the Company on June 10, 1974, when it picketed the Company's premises.[3]

Initially the 17 or 18 members of the petitioning Unions employed by the Company continued to report to work by crossing the picket line. Following a series of harassing incidents, intimations of violence, and vandalized automobiles, these employees met together on July 1, 1974, and decided that they would no longer risk crossing the picket line.[4] As related in petitioners' brief, this decision was reached "notwithstanding the admonition of their union officials that each of their unions was contractually committed to honor a 'no strike' clause."[5] The Unions communicated the

* Hon. Walter P. Gewin, United States Court of Appeals for the Fifth Circuit, sitting by designation.

** Hon. Jack R. Miller, United States Court of Customs and Patent Appeals, sitting by designation.

1. The Board's opinion is reported at 227 N.L.R.B. No. 59 (1976).

2. Section 158(a) provides in pertinent part as follows:
   (a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
   . . . .
   (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.
   Section 157 provides in pertinent part:
   Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing and to engage in other concerted activities for the purpose of collective bargaining . . . .

Section 159(a) provides in pertinent part:
   (a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . .

3. Apparently the picketing continued at least until the time of the hearings before the ALJ in this case.

4. A single employee (a member of Local 51) continued to cross the picket line and to work after July 1. The Company continued to make appropriate wage deductions for this employee to pay his union dues and continued to make pension and welfare contributions on his behalf in accordance with the collective bargaining agreement with Local 51.

5. The "clause" provided: "In the event of a difference arising between . . . [the employer] and the Union, all work shall continue without interruption pending proceedings looking to conciliation or arbitration . . . .

decision to the Company. On July 5, the Company sent Mailgrams to each of the striking Local 51 employees stating that the Company would be "free to replace" the employee if he did not return to work within three days. Similar notices were sent on July 10 to the striking Local 23 and Local 1 employees. The Company also sent Mailgrams to Locals 51, 23, and 1 referring to "a no strike provision" in their collective bargaining agreement and stating that if the Union did not have the members return to work the Company would be "free to replace" the employees who had not returned to work. There was no response from the employees or the Unions, except that Local 23 wrote a letter to the Company denying any contract breach but not otherwise commenting on the Company's Mailgram.

Pursuant to the above notices and all but one of the employees having failed to return to work, the Company hired eleven replacements: two employees were hired to replace the four employees represented by Local 51; six employees were hired to replace the seven Local 23 employees; and three employees were hired to replace the four Local 1 employees.

There was no contact between the Company and the Unions, or between the Company and the replaced workers, until early 1975 (Local 51 on January 23, Local 23 on March 31, and Local 1 on April 5), when the Unions wrote letters requesting the Company to negotiate new agreements with them. The Company answered that objective considerations "conclusively" indicated to management that the respective Union did not represent a majority of the employees in the bargaining unit formerly represented by the Union, and it refused to meet with any of the Unions for the purpose of negotiating a new agreement. During the seven months of no contact with Local 51 and nine months of no contact with Locals 23 and 1, there were no attempts by the Un-

ions to enforce the union security and dues checkoff provisions of the collective bargaining agreements or to require the Company to make health and welfare and pension fund contributions on behalf of the replacement employees or to otherwise police the agreements.

## OPINION

Petitioners would state the issue herein involved as follows:

Was the National Labor Relations Board . . . justified, by substantial record evidence, in dismissing the complaint and refusing to find an unfair labor practice, where the employer refused to bargain with the unions during the terms of their existing collective bargaining agreements, based on the employer's presumption that the unions had lost their majority status?

The Board counterstates the issue thus:

Whether the Board properly concluded that the Company's refusal to bargain with the Unions did not violate Section[s] 8(a)(5) and (1) of the Act because the Company had a reasonably based doubt of each Union's majority status.

However, it is clear that petitioners, in requesting this court to set aside the decision and order of the Board and to remand the case for further proceedings consistent with a determination that the Company violated this Act, are contending that the Board erred in deciding that the Company did not commit an unfair labor practice. Petitioners have a heavy burden of persuading this court that the Board erred. *NLRB v. Purity Food Stores, Inc.*, 354 F.2d 926, 930 n. 19 (1st Cir. 1965). And this entails a showing that the Board's determination is not warranted in the record. *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944).[6] In *Retired Persons Pharmacy v. NLRB*, 519

---

**6.** In *NLRB v. Big Ben Dep't Stores, Inc.*, 396 F.2d 78, 82 (2d Cir. 1968), this court said:

Each case must be decided on its own facts and the Board's determination stands if it has warrant in the record and a reasonable basis in the statute.

Petitioners have advanced no separate argument that the Board's determination does not have a reasonable basis in the statute.

F.2d 486, 489–90 (2d Cir. 1975), this court said that an employer who wishes to withdraw recognition from a union may rebut the presumption of continued representation—

by presenting sufficient evidence to show that the refusal to bargain was based on a serious good faith doubt of the union's majority. . . . It is well settled that in order to establish a good faith doubt the employer must present clear and convincing evidence of loss of union support capable of raising a reasonable doubt of the union's continuing majority.

Accordingly, the dispositive issue is whether petitioners have shown that the evidence in the record is not sufficient to have raised a reasonable doubt on the part of the employer regarding the continuing majority status of each of the Unions, keeping in mind the need for that doubt to have been established by clear and convincing evidence bearing on loss of union support.

The ALJ concluded that, at the time the Company withdrew recognition, each Union had, in fact, continued to represent a majority of the employees in its bargaining unit.[7] First he stated:

It is reasonable to conclude that none of the three unions in fact had been designated by any of the replacements, nor is there evidence to the contrary. This and their apparent lack of interest for several months, reasonably cast serious doubt on each union's continued majority status.

He then found, however, that the replaced workers (who outnumbered their replacements) were economic strikers and that, therefore, they were not dropped from the

bargaining unit for the purpose of determining each Union's continued majority status and the Company's continued duty to bargain with it. He "assumed, absent evidence to the contrary, that each union member continued to designate his union as his bargaining representative."

With respect to the eleven replacements, the Board majority recognized the presumption that new employees will support the union (for the particular bargaining unit) in the same ratio as those employees whom they have replaced,[8] but said this only obtained in the "normal turnover situation" and that it would be "wholly unwarranted and unrealistic" to engage in such a presumption in the present factual situation. The Board majority quoted from *Peoples Gas Systems, Inc.,* 214 N.L.R.B. 944, 947 (1974), *rev'd on other grounds, Teamsters Local 769 v. NLRB,* 174 U.S.App.D.C. 310, 532 F.2d 1385 (1976), as follows:

While it is of course possible that the replacements, who had chosen not to engage in strike activity, might nevertheless have favored union representation, it was not unreasonable for Respondent to infer that the degree of union support among those employees who had chosen to ignore a Union-sponsored picket line might well be somewhat weaker than the support offered by those who had vigorously engaged in concerted activity on behalf of Union-sponsored objectives.[9]

In his brief, counsel for the Board points out that, after the replacements were hired, "the Unions never appeared at the plant or in any other manner made the new employ-

---

7. However, the Board majority cited *NLRB v. Dayton Motels, Inc.,* 474 F.2d 328, 331–32 (6th Cir. 1973), for the statement that "a good-faith doubt exculpates the employer even if the Union in fact represented a majority of the employees." The dissenting Board member agreed that the Company, in defense of its conduct, was not required to establish that the Unions no longer (in fact) represented a majority in their respective units.

8. *Laystrom Mfg. Co.,* 151 N.L.R.B. 1482 (1966), *rev'd on other grounds, NLRB v. Laystrom Mfg. Co.,* 359 F.2d 799 (7th Cir. 1966).

9. Petitioners criticize the Board majority's reliance on *Peoples Gas Systems,* pointing out that in that case some employees crossed their own union's picket line; whereas here "the petitioner unions did not maintain a picket line and made no effort to prevent new employees from working, hence there was no picket line test of new employee support for the petitioner-unions." However, counsel for the Board responds that there was no dispute involving the Unions and, since the replacements were not crossing picket lines sanctioned by the Unions, "the Unions had no reason to be absent from the plant" and "no reason to be uninterested in representing the replacements."

ees aware of their existence"[10] and argues that the Unions "abandoned the units." Although such a conclusion might be reasonable, we need not reach it. Our conclusion simply is that evidence of complete lack of activity by the Unions for a period of seven to nine months is an objective factor which, in the circumstances of this case, would clearly support a reasonable doubt that the replacements desired representation by the Unions. See *Star Manufacturing Co. v. NLRB*, 536 F.2d 1192, 1194 (7th Cir. 1976).

■ One of those circumstances of particular note is the failure of the Unions during this period to make any effort to police the union security provision of the collective bargaining agreements.[11] Considering the importance attached to such a provision by organized labor,[12] evidence of such inaction by the Unions would support a reasonable doubt (that the replacements desired representation by the Unions) just as much as, if not more than, evidence of some affirmative action. The dissenting Board member commented that, while there is no evidence that any of the replacements became Union members, there was (as the ALJ said) no evidence to the contrary—a point clearly at odds with the evidence that the Unions made no effort to police the union security provision of the agreements.

■ With respect to the replaced workers, the ALJ relied on a presumption that economic strikers continue to designate their union as their bargaining representative. However, this is clearly rebutted by evidence of seven to nine months of silence on the part of the replaced workers, with no response to the Company's letters, which had effectively warned that employees violating the no strike clause would be replaced. Violation of that clause by the subsequently replaced workers in the face of admonitions by officials of the Unions and the absence of any showing of interest or support by these employees when the Unions again contacted the Company in 1975, lend further support to the rebuttal. Again, we need not go as far as the Board's Counsel, who argues that these employees, as did the Unions, "abandoned" the bargaining units. We merely conclude that such inactivity on the part of the replaced workers, in the circumstances of this case, with particular reference to complete lack of activity by the Unions, would clearly support a reasonable doubt that the replaced workers considered themselves members of the respective bargaining units.[13]

■ In view of the foregoing, we hold that petitioners have failed to show that the evidence in the record is not sufficient to

10. We take notice that in *Arkay Packaging Corp.*, 221 N.L.R.B. 99, 105 (1975), there was testimony that in late January 1975 an Employees Committee, consisting of representatives from the bargaining units, had been established to deal with the Company, which recognized the Committee as the exclusive bargaining representative of the employees. The Board determined that the "Committee" was a labor organization and held that the Company's recognition, coming at a time when there was a question concerning representation of the employees, was a violation of sections 8(a)(5) and (1). However, it would be reasonable to infer that the "Committee" would not have been established were it not for the void arising from the Union's long-continued inactivity.

11. Petitioners argue that the Company "acknowledged the continued viability of the union contracts by continued wage deductions for union dues, and pension and welfare contributions on behalf of the single member [of Local 51] employed during the strike period." However, we do not regard such action by the Company to have been inconsistent with a rea-

sonable doubt regarding Local 51's continuing majority status in the particular bargaining unit.

12. See *Local 627, Int'l Union of Operating Eng'rs v. NLRB*, 171 U.S.App.D.C. 102, 108, 518 F.2d 1040, 1046 (1975), *rev'd in part on a procedural point*, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 782 (1976).

13. The Board majority said:
   It is equally clear that, not having heard from the 17 or 18 strikers themselves since July 1974, Respondent [Company] could reasonably question both the measure of their support for the Unions as well as their interest in reemployment within the bargaining units.
   We note that the absence of any contact with the Company by the replaced employees was not in the context of a deadlock in the course of a labor dispute in which the deadlock might explain the absence of any contact.

have raised a reasonable doubt on the part of the Company regarding the Unions' continuing majority status.

The petition is denied.